J-S32044-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: T.G.-D. & G.G.-D., MINORS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.D., MOTHER | No. 2592 EDA 2015 |

Appeal from the Decrees August 5, 2015
in the Court of Common Pleas of Philadelphia County
Family Court at Nos.: CP-51-AP-0000603-2014
CP-51-AP-0000604-2014

BEFORE: BOWES, J., MUNDY, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                          **FILED JUNE 14, 2016**

E.D. (Mother) appeals from the decrees, entered in the Court of Common Pleas of Philadelphia County (trial court) on August 5, 2015, that terminated her parental rights to her daughters, T.G.-D., born in March of 2009, and G.G.-D., born in December of 2004 (Children), and changed the Children's goals to adoption. We affirm.[1]

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The Children's father, F.G., is deceased.

The trial court relates the history of this case in its opinion entered on November 13, 2015. We refer the reader to that opinion for the facts of this case. (*See* Trial Court Opinion, 11/13/15, at 1-12).

The trial court held hearings in this matter on December 2, 2014, and August 5, 2015. At the hearing on December 2, 2014, the trial court heard the testimony of DHS case manager, Esmerelda Oetting. At the hearing on August 5, 2015, the trial court heard the testimony of Ms. Oetting, Delta Community Supports caseworker, Frank Citron, and Mother.

The trial court entered its decrees terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8) and (b), and changing the Children's goals to adoption on August 5, 2015. Mother filed her notice of appeal and statement of errors complained of on appeal on August 25, 2015. *See* Pa.R.A.P. 1925(a)(2)(i). The court filed an opinion on November 13, 2015. *See* Pa.R.A.P. 1925(a)(2)(ii).

Mother raises the following questions on appeal:

1)    Did the [trial court] err in terminating Mother's parental rights because the Agency social worker indicated that the [C]hildren are bonded to Mother?

2)    Did the [trial court] err in terminating Mother's parental rights because the Agency social worker indicated that the [C]hildren may suffer harm if Mother's parental rights were terminated?

3)    Did the [trial court] err in terminating Mother's parental rights because Mother was in compliance with the objectives set for her by the [A]gency and/or DHS?

(Mother's Brief, at 3).

- 2 -

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

The trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). We will focus on sections 2511(a)(2) and (b).

Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*　　\*　　\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*　　\*　　\*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2), (b).

It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear

conviction, without hesitance, of the truth of the precise facts in issue." ***In re T.F.***, 847 A.2d 738, 742 (Pa. Super. 2004) (citation omitted). Further,

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. . . .

***In the Interest of K.Z.S.***, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

The Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The Act does not make specific reference to an evaluation of the bond between parent and child, but our case law requires the evaluation of any such bond. ***See In re E.M.***, 620 A.2d 481, 484-85 (Pa. 1993). However, this Court has held that the trial court is not required by statute or precedent to order a formal bonding evaluation performed by an expert. ***See In re K.K.R.-S.***, 958 A.2d 529, 533 (Pa. Super. 2008).

With the above legal standards in mind, we have thoroughly reviewed the record, briefs, and the applicable law, and determined that the evidence presented is sufficient to support the trial court's decrees terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2) and (b). Also, although Mother requests that we change the goal to reunification,

- 5 -

(**see** Mother's Brief, at 10), she did not raise the question of the change of the Children's goal in her statement of errors complained of on appeal. (**See** Mother's Rule 1925(b) Statement, at 1). The issue is, therefore, waived. **See** Pa.R.A.P. 1925(b)(4)(vii); **Yates v. Yates**, 963 A.2d 535, 542 (Pa. Super. 2008).

Our reading of the trial court's opinion reveals that the trial court carefully and methodically reviewed the evidence and ably addressed Mother's issues presented on appeal. (**See** Trial Ct. Op., at 12-22 (finding: (1) Mother did not have a healthy parent-child bond with Children; (2) there was no evidence that there would be any detrimental harm if Mother's rights were terminated; and (3) Mother was not in compliance with her service plan objectives)). Accordingly, we affirm based on the concise, thoughtful, and well-written opinion of the Honorable Vincent L. Johnson, entered on November 13, 2015.

Hence, we affirm the trial court's decrees, entered August 5, 2015, that terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2) and (b), and changed the Children's goals to adoption.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/14/2016

S32044-16

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FAMILY COURT DIVISION**
**JUVENILE BRANCH**

| | | |
|---|---|---|
| In The Interest Of: | : | CP-51-AP-0000603-2014 |
| | : | CP-51-AP-0000604-2014 |
| T.G.D. and G.G.D, Minors | : | |
| | : | |
| Appeal of E.D., Mother | : | 2592 EDA 2015 |

**OPINION**

This Opinion is submitted relative to the appeal of E.D. ("Mother"), from this Court's

Order entered on August 6, 2015, which involuntarily terminated the parental rights of Mother.

For the reasons discussed, this Court respectfully submits that its decision should be affirmed.

**Background**

This case initially became known to the Department of Human Services ("DHS") on May

24, 2011, when DHS received a General Protective Services ("GPS") report alleging that the

family was residing in deplorable conditions: lack of water, gas and electric services, and that the

home was unkempt, dirty and malodorous. This report was investigated by DHS and was

substantiated. During the visit, mother admitted that her bills were behind and that the family

bathed at the neighbor's house. During the visit, they observed that the home's utility services

were connected but that Mother's water heater was inoperable and that T.G.D. and G.G.D (the

Children) appeared dirty, but safe.

On August 17, 2011, the Court deferred adjudication and ordered DHS to supervise the

Children in mother's home. At the same hearing, the Court ordered DHS to assist Mother in

rescheduling her Behavioral Health System (BHS) evaluation, to implement In-Home Protective

Services (IHPS) to assist Mother and to refer Mother to Public Health Management Corporation

1

(PHMC) for a new water heater. On September 13, 2011, IHPS was implemented through Congreso De Latinos.

On December 9, 2011, the Children were adjudicated dependent based on present inability and truancy and the Court ordered DHS supervision to stand. IHPS services were ordered to continue, Mother was re-referred to BHS, and the family was referred to grief counseling[1].

On April 19, 2012, DHS sent Mother a letter informing her of her noncompliance with both her FSP objectives[2] and court orders. The letter also stated that Mother was informed of the importance of maintaining the Children's hygiene and treating the lice infestation.

On April 30, 2012, during the permanency review hearing, this Court discharged DHS supervision and IHPS services. The Children were committed into the care and control of DHS. The Children were committed after testimony from DHS that G.G.D. had 10 unexcused absences and 15 latenesses since the last court date. The Children were ordered to have forthwith physical examinations. Mother was referred to BHS, and DHS was ordered to assist Mother with visits, if necessary. Following the Court hearing, the Children were evaluated at St. Christopher's Hospital for Children. The Children were treated for lice infestation. G.G.D. was also treated for a fungal and bacterial infection.

On June 12, 2012, Mother had a comprehensive biopsychosocial evaluation ("BHS Evaluation") completed at Consortium[3]. The BHS evaluation indicated that Mother had resided with the Children's father until he died. Mother reported to the therapist that the father was

---

[1] On August 3, 2011, DHS learned that the Children's Father was deceased. DHS provided a Certificate of Death and filed it with the Court on October 30, 2014. The date of Father's death was July 27, 2011.
[2] See DHS Exhibit 9.
[3] See DHS Exhibit 10. The Purpose of the evaluation was "to determine Mother's level of functioning and to aid in planning services related to her case."

2

physically abusive to the Children. The physical abuse of the Children continued until the father died on August 3, 2011. In describing the Children's father, Mother indicated that aside from the abuse to her children[4], "he was a good person." Mother's main source of support came from her mother. Aside from the support from MGM, Mother reported that, although she has never had employment, she receives Supplemental Security Income ("SSI")[5] and food stamps. Mother indicated to the therapist that she had received therapy two years ago to cope with the stress of living with her husband who was abusive towards her children. However, Mother stated that she was able to overlook the abuse by saying, "I can't keep letting things keep me down."

After evaluating Mother, the BHS evaluator indicated that Mother had a poor level of insight "as determined by her apparent lack of awareness of ways in which she may have prevented her children from being removed from her care. However, the level of cognitive abilities likely prevents her from developing significantly greater insight than that which she has currently developed." In addition to having a poor insight, Mother's level of impulse control and judgement were also noted to be poor, in light of her allowing her paramour to physically abuse her children. An Intellectual Functioning test was performed on Mother and she was found to have a possible case of Mild Mental Retardation[6]. Based on the BJS evaluator's observations, they recommended that Mother: 1) be referred to the Department of Behavioral Health and Intellectual Disability Services ("IDS"); 2) participate in parenting skills; 3) participate in a life-skills program, ideally through IDS to allow Mother to function more efficiently "despite any possible impairments in cognitive abilities" and; 4) comply with the recommendations of her probation officer.

---

[4] Mother denied that the Children's father and her husband was ever abusive towards her.
[5] Mother reported that she did not know the reason she received SSI, but that she had received benefits since she was 15 years old after MGM applied for her.
[6] Her IQ results were 67, which was noted to be an extremely low score.

3

On October 15, 2012, during the permanency hearing, CUA was ordered to follow-up with the recommendations from Mother's BHS evaluation. Namely, Mother was referred to the Office of Mental Retardation ("OMR"), the Intellectual Disability Services ("IDS") and the Achieving Reunification Center ("ARC"). DHS referred Mother to ARC on November 28, 2012. On December 17, 2012, ARC sent mother a letter[7] informing her that she should seek out DHS to re-refer her to ARC because they were closing her case due to her lack of response. In the letter it further indicates that, "several attempts to reach you since… your referral to schedule you for intake and orientation. To date, you have been non-responsive to all of our outreach efforts[8]…" Mother had a DHS orientation at ARC scheduled for December 5, 2012 and December 8, 2012 to which Mother was a no call and no show for both scheduled dates.

On January 29, 2013, during a permanency hearing, visits with the Mother were modified from supervised to unsupervised visits in the community as arranged by the parties. Mother was re-referred to ARC with DHS to run all clearances for any adults living in Mother's home.

On July 5, 2013, the Children reported to DHS that during the previous home visit, Mother's paramour had "spanked" both of the girls on their buttocks. See also N.T. 8/5/15 at 14. After this incident, the Children both stated that they did not want to return to Mother's home. The Children also reported the incident to their foster parent who confirmed their report with DHS.

On August 15, 2013, DHS revised Mother's FSP objectives[9] to : 1) keep all visits and maintain regular contact with the Children ; 2) maintain contact with the Agency social worker and follow through with ISP; 3) to provide the Children with adequate supervision at all times; 4)

---

[7] See DHS Exhibit 12.
[8] Their outreach efforts were, phone calls, a letter, and home visits.
[9] See DHS Exhibit 13.

4

to provide the Children with regular nutritious meals; 5) ensure that the Children are clean and properly clothed ; 6) to correct the health and safety hazards in the home: fix the holes in the ceiling and in the bathroom; 7) to correct or stabilize physical health, vision, hearing or dental problems; 8) to participate in parenting capacity evaluation with ATA ; 9) keep house clean and free of clutter; and 10) to comply with IDS recommendations. During the revision of the FSP objectives, it was noted that "Mother is inconsistent with everything." Mother was present at this meeting, but refused to sign the revised FSP plan.

On October 25, 2013, G.G.D. wrote a letter[10] to her DHS social worker stating "After the visit last Saturday I felt disgraced because I saw a bed bug. I wanted to see if there was any bug on my body and in my hair. I asked Keisha to wash it. I don't want to go back to my mom's house because of the bugs."

G.G.D.'s letter was admitted into Evidence as DHS #1 at the November 18, 2013 permanency hearing. At this hearing, the Court found Mother to be moderately compliant after Mother made some home repairs and was scheduled to attend parenting classes.

On October 30, 2014, DHS filed the instant Petition for Involuntary Termination of Parental Rights. Hearings on the Petition for Involuntary Termination of Parental Rights were held on December 2, 2014 and August 5, 2015. During the hearing, DHS's Exhibits 1 through 19 were marked and moved into evidence at the hearing. N.T. 8/5/15 at 29. At those hearings, the Court heard from various witnesses on behalf of DHS.

During the termination hearing, DHS admitted into evidence DHS Exhibit 18, which is a visitation log from April 30, 2012 until August 19, 2014. The Children were taken into DHS custody April 13, 2012. N.T. 12/2/14 at 8. Mother had supervised visits in 2012 from May 18,

---

[10] See DHS Exhibit 15.

5

2012 until December 12, 2012. Mother attended all of the scheduled 2012 supervised visits. In 2013, Mother had supervised visits until January 29, 2013 when Mother's visits were changed to unsupervised community day visits. Before the visits were switched to unsupervised visits, Mother had only missed two visits with the Children. After Mother's visits were modified, Mother made 25 out of 35 visits with her children during her community day visits. Mother's visits were modified again on November 18, 2013 and switched back to supervised weekly visits at the Agency. In 2014, Mother attended 6 out of 27 offered supervised weekly visits at the Agency. In total, Mother attended 75 visits since her children came into care and missed 47 visits.

DHS presented the testimony of Esmerelda Oetting, the DHS case manager. Oetting testified that the case came into DHS care because of a May 24, 2011 GPS report that Mother's housing was in deplorable conditions, and that the Children were being medically neglected and they had a history of truancy. N.T. 12/2/14 at 8. DHS services were implemented in the home, however, the Children continued to be behind on their medical, dental and truancy issues. Id. Mother's housing conditions were still not addressed. Id. On April 13, 2012, the Children were removed from Mother's care and placed in foster care through Delta. Id. The Children were committed to DHS on April 30, 2012. On this same day, Mother was referred to BHS for a consultation and evaluation. Id. at 12-13. Mother was also referred to IDS and for her to participate in a life skills program through IDS, however, Quality Progressive had difficulties contacting Mother since July, 2014. Id.

The DHS social worker testified that even though Mother had been ordered to clean up and repair her home, "[she] has been taking her time to do everything. The house continues to be in disarray, clutter, dirty, and it was only recently that she finally cleaned and had some

6

repairments." Id. at 14. When DHS initially became involved with the Children, they had a bad case of lice and G.G.D. had a bacterial infection. Id. at 14-15. When Mother's visits finally were changed to unsupervised visits in 2013, they were suspended January 29, 2013 because of the bed bugs in Mother's home. Id. at 15. Following the January, 2013 hearing, Mother's visits went from unsupervised community day visits to supervised visits at the Agency. Id. The visits were changed because "sometimes when the foster mother drove the Children to the house to have their visits, mother was not there. Her paramour was there. I mean the visits are with the mother not with the boyfriend." Id. at 15-16.

The caseworker also testified that Mother had never inquired about how the Children were doing in placement, attended any report card conferences, acknowledged holidays or birthdays. Mother also never sent any financial support, presents, or any correspondence to the Children since the Children were committed to DHS. Id. at 20-21. At one point Mother had promised to give G.G.D. a pair of sneakers for the child, but never followed through on the promise. Id. The child was "upset and she was sad. She was looking forward to this gift [from Mother]." Id. at 21.

When asked about the bond between Mother and the Children, the social worker stated that although the Children love their mother, there would be no "harm that could not be repaired." Id. at 22-23. Further the DHS social worker testified that it would be in G.G.D.'s best interest if Mother's parental rights were terminated because of "mother's capacity of doing things." Id. at 24. "There was an incident in which I believe [G.G.D.] was playing with mom's cell phone and mother was asking to get the cell phone back and Mario [Mother's paramour] stepped in and started yelling and smacked her." Id. at 24. Mother responded by saying "Oh, don't do it again." The child was hurt by Mother's response. Id.

7

The DHS social worker testified that Mother currently has supervised visits. N.T. 8/5/15 at 6. Throughout the life of the case Mother has been inconsistent with her visits.

> "At one point she stopped visiting for three months. She always has cases of not keeping up with the visits. At one point visits was unsupervised; however, every time foster mom came to deliver the girls, mother was not present. There was one point were there were termites and—or bedbugs…And mother presented a letter stating that she pay for exterminations. When I call there, there was just an estimate that was given to mother. So the visits were reversed to supervised visits.

Id.

DHS changed the goal to adoption on April 28, 2014. N.T. 12/2/14 at 24. The Petitions for the Involuntary Termination of Parental Rights were filed on October 30, 2014. Id. On November 6, 2014, Mother completed the second half of her parental capacity evaluation, seven days after the petitions were filed. Id. Ms. Oetting also testified that the Children "are very happy there [in their pre-adoptive placement] and they're planning to change their last name." Id. at 22.

DHS next presented the testimony of Frank Citron, Delta Community Supports. The Delta caseworker testified to his observations and the visitation log regarding Mother's visits. Although the caseworker could not give an exact number for the missed visits for Mother, he was able to testify that Mother had a lot of excuses for missing the visits[11] with her children. N.T. 8/5/15 at 9. Some of Mother's explanations were appointments, issues with her infant child, not having a babysitter, and weather conditions. Id. Mr. Citron also read into the Record DHS Exhibit 15, which was G.G.D's letter to the case worker, stating that she did not want to return to her mother's home because of issues with bedbugs, and being "disgraced' on seeing a bedbug. Id. at 13. After receiving the child's letter, the Children's visits were changed from unsupervised visits to supervised visits at the agency. Id. at 14.

---

[11] See DHS Exhibit 18 (The visitation log shows that Mother missed more than 40 percent of the offered visits).

8

Mr. Citron testified that Mother's decline in visits correlated with the birth of Mother's youngest child. Id. at 15. T.G.D.'s response to her mother not visiting because of issues transporting her youngest son in inclement weather was "Why doesn't mommy put a blanket over the top of the carrier?" Id. at 16. G.G.D.'s response was: "Why don't you get an umbrella or ask grandma to watch [the child] so you can come?" Id. Also, Mother showed an improvement in attending the visits with the Children after the petitions were filed. Id. at 22.

There was testimony from the Delta caseworker that Mother acknowledged the Children's birthdays and holidays. Id. at 17. The caseworker also testified that there is a bond between Mother and both of the Children, but that there would not be irreparable harm, "that is harm that could not be addressed even by a year's worth of therapy, if mother's parental rights were terminated as to [the Children]" Id. at 18-19. The Children expressed to the caseworker a preference of staying with Mother, but acknowledged that if that were not possible, they would not mind staying in their current foster care placement. Id. at 19. There was also previous testimony by the DHS social worker that the Children made plans to change their last names and are making future plans with the foster mother. N.T. 12/2/14 at 22.

The caseworker also testified that he still had concerns for Mother's capacity to care for the Children and to provide for their health, safety and welfare. N.T. 8/5/15 at 26-27.

After DHS rested its case, Mother's attorney called Mother to the stand as a witness. Mother testified that she could not consistently attend the visits because "I didn't have no way of getting up there only by bus and I wasn't going to take the chance of him [Mother's youngest child] getting sick." Id.at 32. Mother also stated that her youngest son suffers from seizures and that she had no one to watch her child while she attends the visits. Id. Mother stated that she went to IDS last year in the fall. Id. at 33.

At the conclusion of testimony, this Court determined that the testimony of Mr. Frank Oetting was credible and accepted his testimony in full. N.T. 8/5/15 at 40. The Court found Mother's testimony to be partially credible and accepted her testimony in part. The Court determined that:

> "while mom may love her children, the Court does not feel that love is consistent with a loving, caring, and supportive parent. It's a parent's duty to love, protect, provide health, safety, and welfare for the Children. Mr. Citron has testified that while he believes there is a bond there, he believes that mom is incapable of providing, health, safety, and welfare for her children. I asked him directly; he believes that the Children will still be at risk. All parties have accepted the report of Dr. Williams Russell, PhD. He indicates in his report that mom does not present the capacity to provide safety or permanency for her children. This has been accepted by the Court and has been accepted without contradiction or anyone refuting this statement of Dr. Russell."

N.T. 8/5/15 at 40-41; see also N.T. 8/5/15 at 28-29 (all parties agreed to the admission of the Assessment & Treatment Alternatives, Inc. ("ATA") report marked as DHS Exhibit 19).

The ATA report[12] stated that Mother did not have a proper plan on how to support her family with her limited income[13], the only plan was to make ends meet with "the money I get and with Mario's help." Mother proposed that " the two girls and [Mother's youngest son] in one bedroom and we are working on the basement for B.G.D.[Mother's oldest son]" There was also testimony from Mr. Frank who indicated even with Mother's post-petition progress, there remained concerns for Mother's ability to care for the children and provide for their health,

---

[12] The ATA report was completed by Mother on November 6, 2014.

[13] Mother gets $741 in Social Security Income ("SSI"). Mother informed Dr. William Russell Ph.D. that she has received SSI since she was ten or eleven years old. Mother is currently 37 years old. Mother also indicated in the evaluation that her monthly bills were $400 and that her fiancé contributed financially towards the household bills.

10

safety and welfare. Id. at 26-27. The ATA evaluator expressed similar concerns. The ATA report stated that "mom does not present the capacity to provide safety or permanency for her children." Mother did not have a proper plan on how to support her family with her limited income, the only plan was to make ends meet with "the money I get and with Mario's help." Dr. Williams also noted that Mother does not have adequate housing, as she currently resides in a two bedroom home. The report also stated that:

> While she may have presented with cognitive deficits, this does not preclude her from being able to care for her children. Nevertheless, at this time, due to her minimization of issues which precipitated DHS involvement, issues with her home, and the aforementioned concerns…coupled with the aforementioned financial and dependency concerns, [Mother] does not present with the capacity to provide safety and/or permanency to her children at this time.

Dr. William's testimony was not contested by any of the parties during the hearing.

The Court further found that Mother had not completed her FSP objectives prior to the filing of the termination petitions. Mother's improvements were seen only after the petitions were filed: increased visits, and Mother completed parenting[14] Id. at 24-25.

The Court found that DHS had met its burden and presented clear and convincing evidence to support the termination of Mother's parental rights under 23 Pa. C.S. §§ 2511(a)(1), (2), (5), and (8) of the Adoption Act. Id. at 42. Pursuant to 23 Pa. C.S. § 2511(b), the Court further found that while a bond exists between Mother and the Children, it is not a parent-child bond. Id. There was also no request by Mother's attorney for a bond evaluation. Id. at 40.

The Court found that based on the evidence, it was in the best interests of the Children to be adopted and granted the termination of Mother's parental rights on August 5, 2015 based on 2511(a)(1), (2), (5), (8) and 2511(b). Id. This appeal followed.

---

[14] It took two and a half years for Mother to complete parenting classes. N.T. 8/5/15 at 24-25.

11

In Mother's appeal, counsel argues that[15]:

1. The Judge Erred by terminating Mother's parental rights because the agency social [worker] indicated that the children are bonded to Mother.

2. The Judge erred by terminating Mother's parental rights because the agency social worker indicated that the children may suffer harm if Mother's parental rights were terminated.

3. The Judge erred by terminating Mother's parental rights because Mother was in compliance with the objectives set for her by the agency and/or DHS.

4. Mother reserves the right to amend this statement upon receipt of the transcript.[16]

## Discussion

### I. Issues Waived on Appeal

Mother's appellate issues are waived with regard to Issue 4 because her 1925(b) Statement is overly vague and lacks any specificity.

Pursuant to Pennsylvania Rule of Appellate Procedure 1925, an appellant's 1925(b) Statement "shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge." Pa. R.A.P. 1925(b)(4)(ii). "Issues not included in the Statement and/or not raised in accordance with the provisions of this [Rule] are waived." Pa. R.A.P. 1925(b)(4)(vii). Indeed, "[a]n appellant's concise statement must properly specify the error to be addressed on appeal." Commonwealth v. Hansley, 24 A.3d 410,

---

[15] *sic*
[16] No amendment was filed.

12

415 (Pa. Super. 2011) (citation omitted). "[T]he Rule 1925(b) statement must be specific enough for the trial court to identify and address the issue an appellant wishes to raise on appeal." Id.

In Issue 4 , Mother has raised a boilerplate claim that fails to identify any specific issue(s). A "Concise Statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all." Id. at 686-87. For these reasons, Mother has waived Issue 4 on appeal.

## II. The Court did not err in Terminating Mother's Parental Rights Because There was not a Healthy Parent-Child Bond Between Mother and the Children, and There Would be no Detrimental Harm if Mother's Rights were Terminated.

Issues 2, and 3 are related so this Court addresses them together.

A court's decision on whether to terminate parental rights is governed by the statutory requirements of 23 Pa. C.S. § 2511. In re Child M., 681 A.2d 793, 797 (Pa. Super. 1996). The "party seeking to terminate parental rights bears the burden of proving by clear and convincing evidence the statutory grounds for doing so." Id. Appellate review of an order terminating parental rights is limited to a determination of whether the decision of the trial court is supported by competent evidence. In re B.L.W., 843 A.2d 380, 383 (Pa. Super. 2004). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." Id.

In the present case, DHS brought its petition for involuntary termination of Mother's parental rights under 23 Pa. C.S. §§ 2511(a)(1),(2),(5), and (8) of the Adoption Act, which

13

provide, in pertinent part, that the rights of a parent may be terminated upon any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

Once a court has reached a determination that grounds for involuntary termination have been met under 23 Pa. C.S. § 2511(a), consideration under 23 Pa. C.S. § 2511(b) is required. 23 Pa. C.S. § 2511(b) states:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by

14

the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

"Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child." In re C.P., 901 A.2d 516, 520 (Pa. Super. 2006). Further, "analysis of the emotional bond, if any, between parent and child is a factor to be considered in determining the developmental, physical and emotional needs and welfare of the child under section 2511(b)." In re K.K.R. S., 958 A.2d 529, 533 (Pa. Super. 2008). The court must determine "the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." In re C.P., 901 A.2d at 520. The court also must consider "whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." In re of K.Z.S., 946 A.2d 753, 760 (Pa. Super. 2008). Most significantly, the court must give adequate consideration to the needs and welfare of the child. Id.

In the instant case, the Court was satisfied that grounds for termination under each of the above-quoted subsections of the Adoption Act were established by clear and convincing evidence.

**A. Mother did not have a Health Parent-Child Bond with the Children.**

Mother's first issue argues that there was testimony of a bond such that "termination would destroy an existing, necessary and beneficial relationship." In re of K.Z.S., 946 A.2d 753, 760 (Pa. Super. 2008). Although there was testimony that there was some bond between Mother and the Children, "the existence of some bond with Mother does not necessarily defeat termination of her parental rights." In re of K.Z.S., 946 A.2d 753, 764 (Pa. Super. 2008). "The question becomes whether the bond between [the Children] and Mother is the one worth saving or whether it could be sacrificed without irreparable harm to [the Children]." Id. One of the core

15

sources for the strength of a parental bond are the visits between Mother and the Children. The main purpose for offering parents visitation with their children is to "preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained."42 Pa.C.S.A.§ 6301.

Ms. Oetting, the DHS case manager, testified that the Children love their Mother. N.T. 12/2/14 at 22-23. She also testified that Mother never inquired about how the Children were doing in placement, attended any report card conferences, or provided any financial support to the Children since they were committed to DHS. N.T. 12/2/14 at 20-21.

Since DHS became involved with the Children, Mother has had ample time and opportunity to form a healthy bond with her children. DHS became involved with the Children in May 24, 2011. Mother retained custody of her children for a little over a year before the Children were removed from Mother's home[17].

The Children were committed to DHS's care on April 30, 2012 during a permanency review hearing. Since the Children have been in DHS's care, Mother's behaviors with her Children, especially during the visit created an unhealthy bond with her children. Mother missed numerous visits, creating instability with the Children. This resulted in numerous changes to her visits. During the life of this case, Mother has inconsistently attended the visits with the Children for various reasons; i.e., lack of a babysitter, inclement weather and not wanting to transport her youngest child on the bus to attend the visits. N.T. 8/5/15 at 6. Sometimes the Children would be taken for visits with Mother and Mother would not be present and the Children would have to return to their foster placement. Id. at 15-16.

---

[17] The Children were removed because the Children were being medically neglected, continued to have truancy issues and Mother's home continued to have untreated deplorable conditions. Id. When the Children were taken into custody, both of the Children had to be treated for lice and G.G.D. was treated for a bacterial infection. Id. at 14-15.

16

The majority of Mother's visits were supervised, and they never progressed beyond unsupervised day visits. In fact, since the petitions were filed on October 30, 2014, Mother has had two and a half years of supervised visits with her Children. During one visit, there was an incident where Mother's paramour hit G.G.D. and the child did not feel that Mother handled the incident properly. Id. at 24. Prior to Mother's visits being modified, Mother's unsupervised visits at home were suspended due to bed bugs issues in her home. Id. at 15. The issue of bed bugs was brought to DHS's attention after a visit, when G.G.D. wrote her caseworker about being disgraced after seeing a bug at her Mother's home. N.T. 8/5/15 at 13. The child was so traumatized by this event, she wanted to wash up after the incident and have her hair checked out. Id.; See also DHS Exhibit 15. The Children were no longer willing to visit with Mother at her home.

Once the visits were switched back to supervised visits, Mother missed many visits with the Children. Mother blamed her lack of attendance on inclement weather and lack of babysitters. After hearing the reasons for the inconsistent visits, one child asked "Why doesn't mommy put a blanket over the top of the carrier?" The other child asked, "Why don't you get an umbrella or ask grandma to watch [the child] so you can come?" N.T. 8/5/15 at 16. The Children's responses to the visitation issue shows that the Children were aware and hurt because Mother did not consistently visit them.

On the other hand, there was ample unrefuted testimony that indicated that the Children had a close bond with their foster mother and looks to their foster mother as their parent. Further, there was sufficient evidence that the Children's foster mother provided structure and stability for the Children. Ms. Oetting also testified that the Children "are very happy there [in their pre-adoptive placement] and they're planning to change their last name." Id. at 22. As a result, the

17

Court found that there was a parent-child bond between the Children and their foster mother and not between Mother and the Children. Id. at 9.

## B. There Was No Evidence of Detrimental Harm to the Children if Mother's Parental Rights were Terminated.

The Court also heard testimony from Ms. Oetting that there would be no detrimental harm to the Children as time went on if Mother's parental rights were terminated. N.T. 8/5/15 at 18-19. Mr. Frank testified that although it would be difficult for the Children if Mother's parental rights were terminated, the Children were already making plans to change their last names to mirror their foster mother's. N.T. 12/2/14 at 22. The witnesses further testified that with the proper support, the Children would do well over time if the Children were adopted. N.T. 8/5/15 at 18-19.

It should also be noted that Mother was able to attend visits consistently, but only after the petitions for termination were filed. Based on Mother's behaviors and lack of progress prior to the filing of the termination petitions, maintaining Mother's parental rights would not aid in the developmental, physical and emotional welfare of the Children. Id.; *see also* In re K.K.R. S., 958 A.2d 529, 533 (Pa. Super. 2008).

Mother has not maintained a place of importance in the Children's life. She has been inconsistent with visits, made broken promises, put the interest of her boyfriend above the safety of her children. Mainly, Mother has failed to provide consistent communication and association with the Children to ensure a healthy parent-child bond.

Instead, Mother found numerous excuses to place her older children last in her life. At most, Mother's efforts show a passive interest in the lives of her children, evidenced by her inconsistent visits and outreaches to the Children.

18

For these reasons, the Court properly terminated Mother's parental rights because there was no evidence of a healthy parent-child bond that would cause detrimental harm to the Children if Mother's parental rights were severed.

**III.  The Court did not err in Terminating Mother's Parental Rights Because Mother was Not in Compliance with her Objectives set by the Agency.**

Mother argues that she was in compliance with her FSP objectives in satisfaction of the grounds for termination which were 23 Pa. C.S. §§ 2511(a)(1), (2), (5), and (8) of the Adoption Act.

DHS presented the testimony of two witnesses and several exhibits in support of its Petition for Involuntary Termination of Parental Rights. The testimony revealed that the Children have been in foster care for over two years and was placed in care because of Mother's inability to properly care for the Children. N.T. 12/2/14 at 8. These issues continue to exist to this day and Mother's stability remains to be questionable. Specifically, the Court heard from various witnesses, including Mother herself, stated that Mother's inability to provide a safe, healthy and stable environment for the Children is an ongoing issue. There was also testimony of both the case worker and the ATA evaluator that Mother does not have a proper plan to provide a safe, consistent and structured environment for the Children at the current time.

It should also be noted that Mother was able to attend her visits and fulfill her other FSP objectives after the petitions for involuntary termination were filed. Any efforts made by Mother after petitions are filed are not to be considered in the termination hearing. 23 Pa.C.S. § 2511(b). This shows that Mother was able to fulfill the objectives required of her, but only applied herself three years after the Children were taken into DHS custody. Ms. Oetting testified that Mother's

19

rights should be terminated because of "mother's capacity of doing things." Id. at 24. In particular that Mother takes a long time to get a task started and an even longer time to complete tasks. Id.

A parent is required to meet all of their FSP requirements with state intervention within a reasonable period of time. *In re B.L.L.,* 787 A.2d 1007, 1013 (Pa.Super.2001).

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, *1119 protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

In re Z.P., 994 A.2d 1108, 1118-19 (2010).

Mother had not completed any of her FSP objectives prior to the filing of the termination petitions. Prior to the termination petitions, Mother's FSP objectives were: 1) keep all visits and maintain regular contact with the Children ; 2) maintain contact with the Agency social worker and follow through with ISP; 3) to provide the Children with adequate supervision at all times; 4) to provide the Children with regular nutritious meals; 5) ensure that the Children are clean and properly clothed ; 6) to correct the health and safety hazards in the home: fix the holes in the ceiling and in the bathroom; 7) to correct or stabilize physical health, vision, hearing or dental problems; 8) to participate in parenting capacity evaluation with ATA; 9) keep house clean and free of clutter; and 10) to comply with IDS recommendations.

Mother was only consistent with visitation after the petitions were filed on October 30, 2014.

Mother was not able to maintain her home in a safe and healthy environment. Mother's home was still unkempt, with only some repairs done. Mother had bed bugs in the home that were not properly treated. She indicated to the DHS case worker that she had exterminated her house, when all she had actually done was get an estimation. N.T. 8/5/15 at 6.

Mother did not complete the second portion of the ATA parenting capacity evaluation until six days after the petitions were filed. It took Mother two and a half years to complete parenting. Id. at 24. There is no current documentation that Mother complied with her IDS recommendation. Id. at 33.

There was also testimony from Mr. Frank who indicated even with Mother's post-petition progress, there remained concerns for Mother's ability to care for the children and provide for their health, safety and welfare. N.T. 8/5/15 at 26-27. The ATA evaluator expressed similar concerns that even with compliance of the FSP objectives, Mother would not be capable of taking care of the Children. The ATA report states that "mom does not present the capacity to provide safety or permanency for her children." Mother did not have a proper plan on how to support her family with her limited income. The only plan was to make ends meet with "the money I get and with Mario's help." Dr. Williams also noted that Mother does not have adequate housing, as she currently resides in a two bedroom home. The report also stated that:

> While she may have presented with cognitive deficits, this does not preclude her from being able to care for her children. Nevertheless, at this time, due to her minimization of issues which precipitated DHS involvement, issues with her home, and the aforementioned concerns…coupled with the aforementioned financial and dependency concerns, [Mother] does not present with the capacity to provide safety and/or permanency to her children at this time.

In addition to the ATA evaluation, Mother's BHS evaluation showed concerns for Mother's ability to properly care for her children.

21

The BHS evaluation stated that Mother has a poor level of insight "as determined by her apparent lack of awareness of ways in which she may have prevented her children from being removed from her care. However, the level of cognitive abilities likely prevents her from developing significantly greater insight than that which she has currently developed." In addition to having poor insight, Mother's level of impulse control and judgement were also noted to be poor, in light of her allowing her paramour to physically abuse her children. The paramour was not the only occurrence of physical abuse Mother allowed. Until Mother's husband died in 2011, he was physically abusive to all of Mother's Children, although Mother denied that he was physically abusive to her.

Based on the foregoing, this Court properly found that termination of Mother's parental rights would best serve the needs and welfare of the Children.

## Conclusion

For these reasons, the Court respectfully submits that its decision be affirmed.

BY THE COURT,

_____
VINCENT L. JOHNSON, J.

Dated: November 12, 2015

22

# IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FAMILY COURT DIVISION
## JUVENILE BRANCH

|  |  |  |
|---|---|---|
| In The Interest Of: | : | CP-51-DP-0003171-2011 |
|  | : | CP-51-DP-0003173-2011 |
| T.D.G. and G.G.D, Minors | : | FID: 51-FN-002992-2011 |
|  | : |  |
| Appeal of E.D., Mother | : | 2592 EDA 2015 |

## PROOF OF SERVICE

I hereby certify that I am this 12th day of November, 2015, serving the foregoing on the persons indicated below, by first class mail:

Theresa Italiano, Esquire      Counsel for DHS
Assistant City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 16th Floor
Philadelphia, PA 19102

Shanese Johnson, Esquire      Counsel for Mother
230 S. Broad Street, Suite 1501
Philadelphia, PA 19102

Carla Beggin, Esquire      Counsel for Child
1800 JFK Blvd., Suite 300
Philadelphia, PA 19103

Timera Bullock, Esquire
Law Clerk to the Honorable
Vincent L. Johnson