681 A.2d 793

**In re CHILD M., Minor Child.**

**Appeal of Debbie D. SMITH, Natural Mother.**

Superior Court of Pennsylvania.

Submitted April 29, 1996.

Filed July 24, 1996.

Nicole J. Spring, Public Defender, Williamsport, for appellant.

Gerald W. Seevers, Williamsport, for Child M., appellee.

Charles F. Greevy, III, Williamsport, for Lycoming County, Children & Youth Services, participating party.

Before CIRILLO, President Judge Emeritus, BECK, J. and CERCONE, President Judge Emeritus.

CERCONE, President Judge Emeritus:

This is an appeal from a final decree which involuntarily terminated the parental rights of appellant, the natural mother, to her minor child. We affirm.

Lycoming County Children and Youth Agency (the Agency) instituted the action underlying this appeal pursuant to section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2101 *et seq.* The Agency alleged that appellant physically abused her young son, called "Child M." in the trial court filings and proceedings. The Agency also averred that appellant sexually abused the boy and permitted and encouraged others to do so. As a consequence of this alleged ill-treatment, the Agency contended that Child M. suffered severe physical and emotional harm and that his best interests necessitated the termination of appellant's parental rights so that he could be adopted.[1] Appellant denied that she ever abused or neglected her son.

Child M. was born on January 1, 1987 and is now nine years old. The Agency initially became involved with the family in December of 1987 because it received complaints concerning appellant's neglect of her son. In June of 1989, Child M. was hospitalized for abdominal pain and rectal bleeding after ingesting metal fibers which became lodged in his intestinal tract. Five days later, the natural mother was arrested and charged with the murder of Child M.'s younger brother, an infant known as "Child N." While appellant was incarcerated, Child M.'s maternal grandparents assumed custody. However, the Agency opposed that placement because the grandparents had an extensive history of Agency involvement. Nevertheless, the lower court approved the placement of Child M. with his maternal grandparents, subject to protective oversight by the Agency.

1. The trial court opinion indicates that the identity and whereabouts of the boy's natural father are unknown. *See* Trial Court Opinion dated April 24, 1995 at 2. At the hearing conducted on October 4, 1994, the attorney for the Agency indicated that several persons who might be the natural father had already been contacted, and that the Agency was handling those matters separately. N.T. 10/4/94 at 2.

Appellant was ultimately convicted of involuntary manslaughter with respect to the death of Child N. While she was held in the State Correctional Institution at Muncy, the Agency closed Child M.'s case. Appellant was released in December of 1991. The Agency became involved again four months later, in early April of 1992, when it learned that appellant and her paramour were exercising unsupervised custody over Child M. and that someone had taken the boy to a hospital emergency room with injuries sustained after he purportedly fell down a stairway. The Honorable Thomas C. Raup, President Judge of Lycoming County, conducted a hearing on the matter on May 11, 1992 at which all parties were represented by counsel. President Judge Raup did not adjudicate Child M. to be a dependent child, but did enter a consent order remanding the boy to the custody of his maternal grandparents, subject to protective supervision by the Agency. The order provided that all visitation between appellant and Child M. would be supervised by the maternal grandparents.

Four months later, on September 11, 1992, the Agency filed a request for emergency custody alleging that during an investigation of the maternal grandparents for the physical abuse of one of their other grandchildren, the Agency learned that the grandparents were also assaulting Child M. The trial court granted the request and placed Child M. in emergency foster care. The trial court subsequently conducted a hearing on the case and approved long-term foster care placement for Child M. upon appellant's stipulation. At this time, the Agency's goal was to return the boy to his mother. On December 3, 1992, a placement case review resulted in confirmation of the child's dependent status. The court directed the Agency to see that a psychologist monitored the progress of gradually increasing contact between appellant and Child M.

During the supervised visits, the Agency's case workers noted that appellant and her son engaged in interactions of a sexual nature. For example, appellant "nuzzled" the boy on his genitals and fondled him through his pockets. When Child M. responded by touching his mother's breasts, she laughed and giggled at him. In April of 1993, the Agency received a

report that Child M. was the victim of sexual abuse by appellant and her paramour, Larry Probst. According to the report, the sexual abuse consisted of mutual touching of the genitals, oral sex and anal sex. The court appointed a guardian ad litem who filed a petition to terminate visitation between appellant and her son. After conducting a full hearing in the matter, the lower court terminated mother's right to visitation pending the outcome of the sexual abuse investigation.

Two months later, on June 9, 1993, the Agency filed a request to change the goal in the case from "return to the mother" to adoption. The Agency subsequently filed a petition to terminate parental rights. Mother requested an independent psychological evaluation for the child which both the Agency and the boy's guardian ad litem opposed. During the considerable delay that ensued, the court conducted regular placement case reviews. Eventually, the lower court approved mother's petition for the appointment of a clinical psychologist to serve as her expert. Because of mother's indigence, the court also approved payment of the costs for the evaluation. The trial court held a series of hearings on the termination petition between July of 1993 and February of 1995.

On June 14, 1995, President Judge Raup granted the Agency's request and entered a decree nisi involuntarily terminating appellant's parental rights. Appellant filed exceptions, which the trial court denied. President Judge Raup entered a final decree of termination on September 14, 1995. A timely notice of appeal followed. Appellant presents two issues for our consideration: (1) did the trial court err by admitting hearsay statements of the child into evidence and by refusing to require the child to testify; and (2) did the trial court err in denying appellant's request for her psychologist to conduct a joint evaluation session with both appellant and Child M. present?

As an initial matter, we note that Pennsylvania courts place a different emphasis on a decision to involuntarily

terminate the rights of a natural parent than on a petition to change the goal of the family service plan from reunification to adoption. In a change of goal proceeding, the focal point is the child and whether the Agency's goal will serve that child's best interests. *In Interest of M.B.*, 449 Pa.Super. 507, 513, 674 A.2d 702, 705 (1996). By way of contrast, termination proceedings center on the parents, and whether their conduct justifies termination of parental rights. *Id.* This case implicates President Judge Raup's termination order, not his decision to change the Agency's goal from reunification to adoption.

 Pennsylvania law is clear that the trial court's decision on whether to terminate parental rights is governed by the statutory requirements of 23 Pa.C.S. § 2511. *In Interest of M.B.*, 449 Pa.Super. at 512, 674 A.2d at 705; *Commonwealth v. Arnold*, 445 Pa.Super. 384, 389, 665 A.2d 836, 838 (1995). Appellate review of a decree which involuntarily terminates parental rights is limited to a determination of whether the Orphans' Court decision is supported by competent evidence. *In re Adoption of L.D.S.*, 445 Pa.Super. 393, 394, 665 A.2d 840, 841 (1995), *appeal denied*, 544 Pa. 610, 674 A.2d 1073 (1996).

> A party seeking to terminate parental rights bears the burden of proving by clear and convincing evidence the statutory grounds for doing so. *In re E.M.*, 533 Pa. 115, 121, 620 A.2d 481, 484 (1993); *In re Baby Boy S.*, 420 Pa.Super. 37, 44, 615 A.2d 1355, 1358 (1992). "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 521 Pa. 300, 304, 555 A.2d 1202, 1203–1204 (1989). See also: *In re Shives*, 363 Pa.Super. 225, 228, 525 A.2d 801, 802 (1987); *Lookabill v. Moreland*, 336 Pa.Super. 520, 523, 485 A.2d 1204, 1205 (1984).

*In re Bowman*, 436 Pa.Super. 10, 12, 647 A.2d 217, 218 (1994), *aff'd by an equally divided court*, 542 Pa. 268, 666 A.2d 274 (1995). The Superior Court must examine the record closely

in such cases to ascertain whether the evidence supports termination. *Id.* at 14–15, 647 A.2d at 219. We will reverse if the evidence fails to support the Orphans' Court decree and/or when the hearing court has failed to give adequate consideration to the effect of such a decree upon the welfare of the child or children. *Id.* at 15, 647 A.2d at 219.

In this case, the Agency brought its petition for involuntary termination pursuant to section 2511(a)(2) and (5) of the Adoption Act. Therefore, this case must be evaluated under the following terms:

### Grounds for involuntary termination

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(2) and (5). When considering a petition to involuntarily terminate the rights of a natural parent, the hearing court must give primary consideration to the needs and welfare of the child. *In re E.M.*, 533 Pa. 115, 120, 620 A.2d 481, 483 (1993) (citing 23 Pa.C.S.A. § 2511(b)).

■ The statute for terminating parental rights outlines certain irreducible requirements which parents must provide for their children. *In re Diaz,* 447 Pa.Super. 327, 332–333, 669 A.2d 372, 375 (1995). A parent who cannot or will not meet the minimum requirements set by the Juvenile Act within a reasonable time following intervention may properly be considered "unfit," and may properly have parental rights terminated. *Id.* Grounds for termination can consist of lack of capacity and not just affirmative misconduct. *In re E.M.,* 533 Pa. at 120, 620 A.2d at 484. A parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties. *Id.* (citing *In re William L.,* 477 Pa. 322, 345, 383 A.2d 1228, 1239 (1978), *cert. denied,* 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978)).

The essence of appellant's first contention is that the trial court did not possess an adequate record for its decision because the certified record is allegedly replete with hearsay statements. Appellant argues that no statutory or common law exceptions to the hearsay rule cover the challenged evidence. Appellant also complains that her "confrontation rights" were denied by the admission of the purported hearsay and by the trial court's refusal to force the child to testify.

■ We shall address the final contention first. Appellant concedes that this case implicates only the Adoption Act and that she was not criminally charged with abusing Child M. Consequently, appellant has no recourse to the constitutional provisions which protect defendants in criminal proceedings. It is correct to characterize the termination of parental rights as carrying "a constitutional significance" because of the importance of the rights involved. *T.J.B. v. E.C.,* 438 Pa.Super. 529, 543, 652 A.2d 936, 943–44 (1995). For this reason, our courts require clear and convincing evidence which proves the statutory grounds before they will act to sever the bonds between a natural parent and her child. *Id.* Nevertheless, despite the constitutional dimension of termination proceedings, there exists no direct civil equivalent to the federal or state constitutional clauses that govern the prosecution of crimes. Appellant has not cited any judicial decision, statute

or constitutional provision which would entitle a natural parent to force an abused child to testify in an involuntary termination proceeding. We decline to create any such requirement.

The certified record shows that the hearing judge did not prohibit Child M. from appearing out of any desire to prejudice appellant's case. As President Judge Raup explained on the record, he possessed clear evidence that there was a significant potential of inflicting severe psychological harm if Child M. were required to appear before the court. N.T. 2/95 at 271.[2] In light of the extensive evidence presented on this point, which we discuss further *infra*, we cannot disagree with this determination by President Judge Raup. *See In re Diaz*, 447 Pa.Super. at 332–333, 669 A.2d at 375 (it is the prerogative of the hearing judge to make credibility determinations and to resolve conflicts in the evidence; the Superior Court may not reverse unless the hearing court's conclusions have no support in the record, involve errors of law or are clearly unreasonable in light of the factual findings).

Appellant next contends that the statutory exception to the hearsay rule set forth at section 5985.1 of the Judicial Code is inapplicable to this case. We agree with this position. By its own terms, section 5985.1 is only relevant to criminal proceedings.[3] However, we find this to be a "non-issue" in the

2. There is some confusion in the record as to whether this hearing occurred on February 1 or 2 of 1995. Both dates are reflected in the transcript. *See* N.T. 2/1/95 at 1 (cover sheet designating hearing date as "February 1, 1995") and at 200 (giving date as "February 2, 1995" at beginning of transcription for testimony taken at the hearing).

3. **Admissibility of certain statements**
 (a) **General rule.**—An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing the contact, sexual intercourse or deviate sexual intercourse performed with or on the child by another, not otherwise admissible by statute or rule of evidence, is admissible evidence in any criminal proceeding if:
 (1) The court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability.
 (2) The child either:
 (i) testifies at the proceeding; or

present case because the certified record contains absolutely no indication that President Judge Raup ever invoked section 5985.1.

Appellant also complains that the trial court erred in admitting hearsay testimony into the record pursuant to the statutory exception set forth at section 5986 of the Judicial Code. The statute in question contains the following language:

### Hearsay

A statement made by a child describing acts and attempted acts of indecent contact, sexual intercourse or deviate sexual intercourse performed with or on the child by another, not otherwise admissible by statute or court ruling, is admissible in evidence in a dependency proceeding initiated under Chapter 63 (relating to juvenile matters), involving that child or other members of that child's family, if a court finds that the time, content and circumstances of this statement provide sufficient indicia of reliability.

42 Pa.C.S.A. § 5986.

Our inspection of the certified record indicates that President Judge Raup explicitly invoked section 5986 and permitted Ms. Linda Bloom, a caseworker for the Agency, to testify at a hearing conducted on July 6, 1993. This hearing was convened as a dependency proceeding initiated under the Juvenile Act. N.T. 7/6/93 at 4. President Judge Raup was thus entitled to admit testimony under section 5986 as long as he found that all the statutory conditions were fulfilled. However, the propriety of the lower court's evidentiary rulings during the dependency proceedings are not presently before this court. This appeal arises from the decree of termination. The certified record clearly indicates that during the hearings conducted for the specific purpose of considering the termination petition, President Judge Raup carefully excluded from consideration hearsay statements admitted during prior proceedings. *See, e.g.,* N.T. 10/4/94 at 21, 25, 26, 27, 32 (respec-

(ii) is unavailable as a witness and there is corroborative evidence of the act.

42 Pa.C.S.A. § 5985.1(a).

tively excluding: details of abuse referral by hospital staff; factual findings made following prior agency proceeding; results of police investigation of whether Stroehmann's Bakery placed metal fibers into its bread; administrative findings pursuant to dependency proceedings; and reports by prison officials of appellant's conduct while she was incarcerated for killing Child N.). The record does not support the conclusion that President Judge Raup relied upon section 5986 during the course of the hearings called to address the termination petition.

 Next, appellant makes a highly generalized complaint that the hearing court erred by admitting the statements of counseling professionals, caseworkers and Child M.'s foster parents concerning the boy's remarks to them. It is well-settled that an appellant must provide the Superior Court with proper references to the specific place in the certified record at which challenged testimony appears. Pa.R.A.P., Rule 2119(c), 42 Pa.C.S.A. Unfortunately, appellant has not supplied us with the necessary citations to President Judge Raup's allegedly erroneous evidentiary rulings. We cannot scour the record on appellant's behalf trying to find mistakes by the hearing judge. It is the appellant's responsibility to precisely identify any purported errors. *Id.* We cannot address appellant's sweeping charge that the lower court incorrectly admitted too much "hearsay" because we lack references to specific instances of alleged lower court error and because appellant has failed to provide any argument concerning the pertinent rules of evidence with a discussion of all relevant exceptions to the hearsay rule. *See* Rule 2119(a) (the "argument" section of an appellate brief must contain a full discussion of the points raised accompanied by citation to pertinent authority).

 We hasten to add, however, that we have fully and carefully studied the entire evidentiary record in this case in order to determine whether it supports the termination order. *See In re Bowman, supra* (explaining the Superior Court's role when reviewing this type of appeal). In the context of

this review, we have a few general comments on Pennsylvania law concerning hearsay evidence. First, we note that the well established definition of "hearsay" is evidence which contains "an out of court statement offered to prove the truth of the matter asserted." *Hammel v. Christian,* 416 Pa.Super. 78, 82, 610 A.2d 979, 981 (1992), *appeal denied,* 533 Pa. 652, 624 A.2d 111 (1993). Not all remarks which a witness attributes to another person can properly be characterized as "hearsay."

[A]n out-of-court statement is not hearsay when it is introduced purely for the purpose of establishing that the statement was made and not to establish its truth. Likewise, an out-of-court statement is not hearsay if it is offered to explain a course of conduct or to reflect the declarant's state of mind.

*Spotts v. Reidell,* 345 Pa.Super. 37, 42, 497 A.2d 630, 633 (1985) (citations omitted).

 We agree with the Agency's argument that the mental health professionals, Agency caseworkers, and Child M.'s various foster parents properly testified concerning their direct observations of Child M.'s conduct. For the most part, this evidence was not hearsay because it focussed on observed behavior and not on statements attributed to the child. *See Matter of Cunningham,* 517 Pa. 417, 438–439, 538 A.2d 473, 484, *appeal dismissed,* 488 U.S. 805, 109 S.Ct. 36, 102 L.Ed.2d 16 (1988) (explanatory words are not hearsay when under the substantive law the pertinent inquiry is directed only to objective manifestations rather than to the actual intent or other state of mind of the actor). Nevertheless, we note that testimony as to what a child tells other people is admissible in order to establish that child's mental state at the time he or she made the comment. *Rinker Appeal,* 180 Pa.Super. 143, 153, 117 A.2d 780, 786 (1955). *See Liles v. Balmer,* 439 Pa.Super. 238, 249, 653 A.2d 1237, 1242 (1994) (discussing L. Packel & A. Poulin, *Pennsylvania Evidence* § 801.3 regarding non-hearsay "state of mind" testimony). It was proper for President Judge Raup to permit mental health professionals to explain Child M.'s needs for particular types of therapy and to admit testimony that documented the child's mental state

and his manifestations of trauma. *See also Bonavitacola v. Cluver*, 422 Pa.Super. 556, 571–73, 619 A.2d 1363, 1371–72, *appeal denied*, 535 Pa. 652, 634 A.2d 216 (1993) (discussing the "state of mind" exception to the hearsay rule and also explaining why a statement which appears to be hearsay nevertheless may be admissible if offered for reasons other than proving the truth of the matter asserted); *Pennsylvania Evidence*, *supra*, § 803.3 (explicating "state of mind" exception to hearsay rule).

 Appellant's final argument regarding the evidence admitted in this case centers on the hearing judge's treatment of testimony concerning Child M.'s "recantation" of his allegations of sexual abuse. Specifically, appellant contends that President Judge Raup did not give sufficient consideration to evidence that, after receiving Christmas presents from his mother in December of 1993, Child M. told counsellors and caseworkers that appellant had never sexually abused him. *See* Appellant's brief at 13 (citing N.T. 10/4/94 at "291–225" and 249 as well as 10/6/94 at 112–114). When the Orphans' Court has granted a petition to involuntarily terminate parental rights, the Superior Court must accord the hearing judge's decision the same deference we would give to a jury verdict. *In re Adoption of B.G.S.*, 418 Pa.Super. 588, 597–98, 614 A.2d 1161, 1166 (1992), *appeal discontinued*, 535 Pa. 628, 631 A.2d 1002 (1993). As trier of fact, only the hearing judge may assess the weight and credibility of the witnesses' testimony. *Id.* It is up to the hearing judge to resolve any conflicts in testimony. *Id.* We may reverse the termination decree only if the lower court's factual findings are not supported by the record or if the hearing judge applied an incorrect legal standard. *Id.*

Our initial difficulty in reviewing appellant's challenge to the weight accorded to the "recantation" evidence is that appellant cites pages "291–225, 249" from the transcript of the hearing conducted on October 4, 1994 as two locations in which testimony on this point was recorded. The transcript for October 4th ends on page 132; it does not contain any number as high as either 225 or 291. The notes of testimony for the hearing

conducted October 5, 1994 have been transcribed as a continuation of the October 4th transcript. The October 5th transcript begins on page 132 and ends on page 277. We therefore assume that appellant meant to cite pages 191–225 and 249 of the transcript from the October 5th hearing rather than "291–225, 249" of the October 4th transcript.

██ The testimony at issue here was provided by Roberta Marshall, a licensed psychologist who serves as Coordinator of the Child Victims Program for Divine Providence Mental Health Center. *See* N.T. 10/5/94 at 185–276. Ms. Marshall began treating Child M. in May of 1993 and continued therapy until shortly before the termination hearings commenced in October of 1994. The witness discussed the manner in which Child M. was referred to Divine Providence and the various therapeutic regimens used in his case. Ms. Marshall explained the extreme difficulty of treating the boy because of his fear, his ambivalent feelings toward family members, and his lack of trust in strangers. In particular, the psychologist noted that Child M. hid under furniture and reverted to a fetal position when violence was mentioned or if he was questioned about his mother. *Id.* at 192–197. Ms. Marshall described the progress of the therapy sessions and the boy's increasing willingness to discuss specific incidents of sexual abuse. She gave a lengthy explanation of the art therapy program in which Child M. participated and showed President Judge Raup various drawings the boy produced during these sessions. *Id.* at 200–212, 216–17. In the course of her testimony, Ms. Marshall discussed specific incidents of "sexually reactive behavior" which Child M. displayed including masturbation and attempts to sexually abuse younger children.[4] *Id.* at 212–215.

At one point in his therapy, Child M. began to ask Ms. Marshall about adoption and why other foster children could be adopted into a "forever place" but he could not. *Id.* at 218. In discussing her response, and the child's repeatedly ex-

---

4. The witness defined "sexually reactive behavior" as occurring when children touch other children in a manner associated with victimization rather than normal curiosity. N.T. 10/5/94 at 213.

pressed desire for a permanent home, Ms. Marshall mentioned the boy's continuing ambivalence toward his mother. Child M. displayed a protective attitude toward appellant and worried that the police would put her in jail again, but he did not want to live with her because he feared a repeat of the "bad stuff" that happened in her home. *Id.* at 218–225, 227–235. In this context, Child M. talked about Christmas presents he received from his natural mother, the fact that he was acquainted with another foster child who was permitted to visit his own natural mother, and the different kinds of parental relationships portrayed in the movie *Mrs. Doubtfire. Id.* at 218–225. The psychologist explained that Child M. sometimes told lies about the events of his life because he was jealous of other children, confused about his emotions on a particular day, suffering from low self-esteem, or feeling the need to protect his natural mother from the police. *Id.* at 243–246, 249–250, 253–255, 260–263, 265, 271, 275–276. Ms. Marshall also testified that this type of behavior was normal in sexual abuse cases and that the trauma the child had experienced manifested itself in various ways, from denial that the events had ever occurred to physical tics and stammering. *Id.* at 260–270.

When viewed in its full context, it is obvious that Ms. Marshall attempted to provide the hearing court with a complete and balanced picture of Child M.'s mental state and the progress of his therapy. She neither glossed over instances in which Child M. denied that he had ever suffered from sexual abuse nor did she attempt to minimize the importance of these incidents. It was up to President Judge Raup, as the hearing judge, to decide whether he found Ms. Marshall to be credible and to determine how much weight he would assign to her testimony. *In re Diaz,* 447 Pa.Super. at 332–333, 669 A.2d at 375. We find no basis in the certified record to support the conclusion that President Judge Raup made an error of law in admitting this evidence or that he committed any abuse of discretion in his consideration of Ms. Marshall's testimony.

Appellant also challenges the weight given to evidence presented by Laura Quick regarding the aftermath of Child

M. receiving Christmas presents from his natural mother. Ms. Quick was the Agency caseworker who actually accepted the gifts and conveyed them to Child M. Her initial testimony on this point consisted of a factual description of her actions in delivering the presents and she did not discuss Child M.'s response. *Id.* at 111–114. Later, however, Ms. Quick stated that Child M. "reacted badly" even to this indirect contact with his mother. *Id.* at 119–120, 123–124. The witness was not asked for specific details concerning Child M.'s behavior and she did not volunteer such information. We see no indication in the certified record that President Judge Raup erred in receiving this evidence or that he either over- or under-emphasized it in reaching his ultimate decision in the case.

 The final contention on appeal is that the lower court committed reversible error by refusing to grant appellant's request for her own psychologist to conduct a joint session with both appellant and Child M. Although appellant claims that there has been no opportunity to "formally observe" the mother and child together, this is a patently false statement. Dr. Dan Egli, a clinical psychologist, evaluated Child M. and appellant for the court. *See* N.T. 10/6/94 at 49–88. As part of the evaluation process, Dr. Egli conducted six sessions with appellant and Child M. *Id.* at 58. The psychologist saw appellant and Child M. separately on three of these occasions. However, Dr. Egli directly observed the interaction between the boy and his mother during the remainder of the sessions. *Id.* Child M. displayed confusion, heightened anxiety and the effects of trauma when in his mother's presence. *Id.* at 59–60.

Also, contrary to appellant's characterization of this case, the lower court did not approach the request for an additional evaluation of Child M. in a cursory manner. On June 17, 1994, President Judge Raup conducted a hearing to determine whether it would be harmful to permit appellant's psychologist to examine Child M. Roberta Marshall, a licensed psychologist with Providence Health Systems, discussed her connection with the case. Ms. Marshall met with Child M. for three hours of counselling each week. She explained in detail the

specific methodology she employed during these sessions, and stated that the boy manifested extreme difficulty in dealing with the sexual assaults he had endured and the physical abuse he had suffered. In particular, Child M. could not resolve the emotions associated with the murder of his younger brother. N.T. 6/17/94 at 3–7. He could not easily discuss any family related issues. To avoid questions pertaining to his mother, he would "roll up in a ball," hide under furniture, or curl into the fetal position. *Id.* at 4, 13.

The therapist considered it inadvisable to order an independent psychological evaluation for Child M. at this stage of his life because forcing him to reveal the details of his abuse to a stranger was highly likely to cause additional and severe trauma. *Id.* at 6, 13, 14, 17–18. Ms. Marshall stressed the fact that Child M. had already recounted his story to several Agency caseworkers and therapists, and that each time it was a very difficult struggle for him. *Id.* at 13. The witness also recounted physical symptoms and regressive behavior the child exhibited when he was compelled to discuss his experiences. Ms. Marshall concluded that she believed it would be harmful to force Child M. to relive the circumstances of his abuse yet another time under circumstances not directly related to his treatment. *Id.* at 17–18.

Nevertheless, President Judge Raup permitted appellant's expert to interview and observe the child. Dr. Steven Anthony Ragusea, a licensed psychologist, testified that he evaluated Child M., appellant, and appellant's paramour. At the hearing conducted on November 29, 1994, Dr. Ragusea admitted that the facts associated with this case could give rise to an inference of sexual abuse, and that such an inference was even "likely." N.T. 11/29/94 at 155, 165. Furthermore, Dr. Ragusea conceded that the information he had received, in both written and oral reports, indicated that the interaction was "extremely traumatic" for Child M. the last time he saw his natural mother, that the boy curled into a fetal position and that he remained upset and dysfunctional for a "substantial period of time" thereafter. *Id.* at 122–123.

As we have already explained, the hearing court must give primary consideration to the needs and welfare of the child when considering a petition to terminate parental rights. *In re E.M.*, 533 Pa. at 120, 620 A.2d at 483. In light of the extensive evidence contained in the certified record, we can only conclude that President Judge Raup carefully weighed both appellant's rights and the court's indisputable duty to protect Child M. from further trauma. *See In re Diaz*, 447 Pa.Super. at 336–338, 669 A.2d at 377 (the courts must remember that the essential needs of the child must be considered as well as the rights of the parent). Under the circumstances of this case, we cannot fault President Judge Raup for deciding that it was wrong to subject the child to a second set of joint evaluation sessions with his natural mother.

Mindful of the proper standards applicable on appeal from an order involuntarily terminating parental rights, we have meticulously reviewed the entire certified record forwarded to this court. We find that clear and convincing evidence exists of record which fully supports President Judge Raup's ruling. We therefore affirm the final decree of termination.

Decree affirmed.