J-S01040-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.J.M., a Minor | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.B., Mother | : | No. 1208 MDA 2016 |

Appeal from the Decree entered June 28, 2016
in the Court of Common Pleas of Dauphin County,
Orphans' Court at No(s): 39-AD-2016; CP-22-DP-117-2013

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.O.B., a Minor | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.B. | : | No. 1209 MDA 2016 |

Appeal from the Decree entered June 28, 2016
in the Court of Common Pleas of Dauphin County,
Orphans' Court at No(s): 38-AD-2016; CP-22-DP-116-2013

BEFORE:  GANTMAN, P.J., DUBOW and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED FEBRUARY 27, 2017**

M.B. ("Mother") appeals from the Decrees[1] granting the Petitions filed by Dauphin County Social Services for Children and Youth ("SSCY"), involuntarily terminating her parental rights to her son, Z.O.B., born in August 2011, and her daughter, Z.J.M., born in December 2012 (collectively, "Children"), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b),

---

[1] This Court, *sua sponte*, consolidated Mother's appeals from the termination Decrees.

and changing their permanency goals to adoption.[2]  Additionally, Damian J. DeStefano, Esquire ("Attorney DeStefano"), has filed a Petition to Withdraw as counsel and an accompanying brief pursuant to ***Anders v. California***, 386 U.S. 738, 744 (1967).  We grant Attorney DeStefano's Petition to Withdraw, and affirm the trial court's Decrees.

In its Opinion, the trial court aptly summarized the facts underlying this case, which we adopt for the purpose of this appeal.  ***See*** Trial Court Opinion, 8/31/16, at 1-5, 6-8.  By Decrees dated June 28, 2016, the trial court granted SSCY's Petitions, involuntarily terminating Mother's parental rights to Children, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b), and changing Children's permanency goals to adoption.

Mother, through counsel, filed timely Notices of Appeal.[3]  Attorney DeStefano subsequently filed a Petition to Withdraw as counsel and an ***Anders*** Brief, in lieu of a Pa.R.A.P. 1925(b) Concise Statement of errors complained of on appeal.

---

[2] SSCY included A.M. ("Father") in its Petitions.  In its June 28, 2016 Decrees, the trial court also involuntarily terminated Father's parental rights to Children.  Father filed separate appeals from the Decrees, which include Nos. 1164 MDA 2016, 1165 MDA 2016, 1240 MDA 2016 and 1241 MDA 2016, and is not a party to the instant appeal.

[3] We observe that it was improper for Mother to file a single Notice of Appeal as to each child with the Orphans' Court, as each Decree identified, and was entered on, both the Juvenile Court and the Orphans' Court dockets.  ***See*** Pa.R.A.P. 341, Note (stating that "[w]here, however, one or more orders resolves issues *arising on more than one docket* or relating to more than one judgment, separate notices of appeal must be filed.") (emphasis added).  Nevertheless, because we discern no prejudice arising from this procedural misstep, we decline to quash Mother's appeal.

In the **Anders** Brief, the following claims are presented for our review:

I. Whether the trial court erred [or] abused its discretion when it[] changed the [permanency] goal from reunification to adoption?

II. Whether the trial court erred [or] abused its discretion when it involuntarily terminated [] Mother's parental rights?

**Anders** Brief at 11. Mother neither filed a *pro se* brief, nor retained alternate counsel for this appeal.

We must first determine whether Attorney DeStefano has complied with the dictates of **Anders** in petitioning to withdraw from representation. **See In re X.J.**, 105 A.3d 1, 3 (Pa. Super. 2014) (stating that "[w]hen counsel files an **Anders** brief, this Court may not review the merits without first addressing counsel's request to withdraw."). This Court has extended the **Anders** principles to a first appeal by an indigent parent from a decree involuntarily terminating his or her parental rights. **See In re V.E.**, 611 A.2d 1267, 1275 (Pa. Super. 1992). Pursuant to **Anders**, when an attorney believes that an appeal is frivolous and wishes to withdraw as counsel, he or she must

(1) petition the court for leave to withdraw stating that after making a conscientious examination of the record and interviewing the [client], counsel has determined the appeal would be frivolous, (2) file a brief referring to any issues in the record of arguable merit, and (3) furnish a copy of the brief to [the client] and advise him of his right to retain new counsel or to raise any additional points that he deems worthy of the court's attention.

*In re S.M.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004) (citation omitted). With respect to the third requirement of **Anders**, *i.e.*, that counsel inform the client of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to [a] petition to withdraw a copy of the letter sent to the[] client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, the Pennsylvania Supreme Court has determined that a proper **Anders** brief must

> (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Commonwealth v. Santiago*, 978 A.2d 349, 361 (Pa. 2009). Once counsel has satisfied the above requirements, this Court "must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." *In re S.M.B.*, 856 A.2d at 1237.

Here, Attorney DeStefano has complied with the requirements set forth in **Anders** by indicating that he made a thorough review of the record and determined that an appeal would be frivolous. Further, Attorney DeStefano provided a letter to Mother, informing her of Attorney DeStefano's intention to withdraw, and advising Mother of her rights to retain counsel, proceed *pro se*, and file additional claims. Finally, Attorney

DeStefano's **Anders** Brief meets the standards set forth in **Santiago**. Because Attorney DeStefano has complied with the procedural requirements for withdrawing from representation, we will independently review the record to determine whether Mother's appeal is, in fact, wholly frivolous.

As Mother's claims are related, we will address them together. In her first claim, Mother argues that the trial court erred in changing Children's permanency goal to adoption. **Anders** Brief at 18. In her second claim, Mother argues that the trial court abused its discretion by involuntarily terminating her parental rights to Children. **Id.** at 21.

In its Opinion, the trial court set forth the relevant law, addressed Mother's first claim, and concluded that it lacks merit. **See** Trial Court Opinion, 8/31/16, at 8-14; **see also id.** at 12 (wherein the trial court adopted its reasoning as set forth on the record during the termination hearing); N.T., 6/28/16, at 117-25. We agree with the reasoning of the trial court and affirm on this basis as to Mother's first claim. **See** Trial Court Opinion, 8/31/16, at 8-14.

Additionally,

[p]ursuant to [Section] 6351(f) of the Juvenile Act, [42 Pa.C.S.A. § 6351(f),] when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the

- 5 -

child has been in placement for the last fifteen of the last twenty-two months. The best interests of the child, not the interests of the parent, must guide the trial court. As this court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

At the time SSCY filed the Petitions, Children had been in SSCY's care for 32 months. *See* Trial Court Opinion, 8/31/16, at 5. At the termination hearing, the trial court stated, on the record, that Children's needs "have not and will not be met with Mother…." N.T., 6/28/16, at 122. The trial court reasoned that Mother failed to satisfy her service objectives because she had not found suitable housing and had not provided proof of employment; Mother did not complete her mental health objectives; Children have a close emotional bond with the foster family, but not with Mother; and there are new substance abuse concerns because Mother tested positive for cocaine and oxycodone within the three weeks before the termination hearing. *See id.* at 121-22. The trial court also stated that the evidence "screams, cries for [C]hildren to be placed in a home where they're going to be loved and cared for," and noted that the foster family has been providing love, care and discipline for Children for more than two years. *See id.* at 122-23. Upon review, we conclude that sufficient competent evidence supports the goal change to adoption. Thus, we conclude that Mother's second claim is frivolous.

Further, our independent examination of the record indicates that there are no other non-frivolous claims that can be raised. *See In re S.M.B.*, 856 A.2d at 1237. Accordingly, we conclude that Mother's appeal is frivolous, and grant Attorney DeStefano permission to withdraw as counsel.

Petition to Withdraw granted; Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/27/2017

**ORIGINAL**

| | |
|---|---|
| IN THE INTEREST OF | : IN THE COURT OF COMMON PLEAS<br>: DAUPHIN COUNTY, PENNSYLVANIA<br>: |
| Z.O.B., a Minor | : NO. 38 ADOPT 2016/CP-22-116-2013<br>: |
| | : |
| APPEAL OF M.B., Mother | : SUPERIOR COURT<br>: DOCKET NO. 1209 MDA 2016 |

| | |
|---|---|
| IN THE INTEREST OF | : IN THE COURT OF COMMON PLEAS<br>: DAUPHIN COUNTY, PENNSYLVANIA<br>: |
| Z.J.M., a Minor | : NO. 39 ADOPT 2016/CP-22-117-2013<br>: |
| | : |
| APPEAL OF M.B., Mother | : SUPERIOR COURT<br>: DOCKET NO. 1208 MDA 2016 |

| | |
|---|---|
| IN THE INTEREST OF | : IN THE COURT OF COMMON PLEAS<br>: DAUPHIN COUNTY, PENNSYLVANIA<br>: |
| Z.O.B., a Minor | : NO. 38 ADOPT 2016/CP-22-116-2013<br>: |
| | : |
| APPEAL OF A.M., Father | : SUPERIOR COURT<br>: DOCKET NO. 1240 MDA 2016 |

| | |
|---|---|
| IN THE INTEREST OF | : IN THE COURT OF COMMON PLEAS<br>: DAUPHIN COUNTY, PENNSYLVANIA<br>: |
| Z.J.M., a Minor | : NO. 39 ADOPT 2016/CP-22-117-2013<br>: |
| | : |
| APPEAL OF A.M., Father | : SUPERIOR COURT<br>: DOCKET NO. 1241 MDA 2016 |

**FILED**

AUG 31 2016

JEAN MARFIZO KING
REGISTER OF WILLS AND
CLERK OF THE ORPHANS' COURT

## TRIAL COURT OPINION

These appeals follow the Decrees filed June 28, 2016, which terminated the parental rights of
M████ B███("Mother") and A████████ M█████("Father") to Z████O██B████
("Z.O.B."), born 8/23/11 and Z█████J████M██████(Z. J.M."), born 12/3/12 ("Children").
[1]For the reasons set forth, the Decrees should be affirmed. [2]


## FACTUAL AND PROCEDURAL BACKGROUND

### MOTHER

Dauphin County Social Services for Children and Youth ("Agency") first became involved
with Mother in April 1999 while working with Mother's other children, all of whom who were
removed from her care. (N.T. p. 28). Mother has a total of 9 children, only one of whom remains
in her care. *Id.* [3] Prior to Children's placement into the care of the Agency which is the subject of
these proceedings, Ms. Candice Raines served as caseworker for Mother and Children from
April 2012 through November 2013. (N.T. pp. 26-27). During that period, the Agency assisted
Mother with establishing stable housing and providing for the basic needs of the children such as
diapers, wipes, formula and bedding. (N.T. p. 29). The Agency offered Mother parenting classes
with which she did not follow through. (N.T. pp. 29-31). The home in which Mother and
Children lived was dirty, cluttered and unsafe. (N.T. p. 30). Mother resided with her sister, who
had addiction problems. (N.T. p. 31). At one point, the house in which Mother lived burned

---

[1] On July 22, 2016, counsel for Mother filed a Notice of Appeal which set forth counsel's statement as to the conclusion that no non-frivolous issues exit and the intention to file a Petition to Withdraw and supporting brief as required by *Anders v. California*, 386 U.S. 738 (1967) and *Commonwealth v. McClendon*, 434 A.2d 1185 (Pa. 1981). Accordingly, counsel filed no statement of matters complained of on appeal.
[2] The Decree as to Z.J.M. also terminates the rights of "Unknown Father" in that Z.J.M.'s birth certificate lists the father as "unknown". A████M██████claims that he is the father of Z.J.M.
[3] That child is not a subject of these proceedings.

1

down. She rented rooms or stayed with friends. (N.T. p. 33). Overall, Mother's housing situation remained unstable. (N.T. p. 30).

In June 2013, a foster family, the S█████, informally assumed the care of Children. (N.T. p. 35). During Children's stay with the foster family, Mother visited Children. *Id.*

On October 11, 2013, while Children were in Mother's care, the Agency received a referral which indicated that Mother cut her wrists and posted a "goodbye letter" on Facebook. (N.T. pp.35-36). The Agency assumed temporary care and custody of Children. (N.T. p. 36).

On October 23, 2013, an Adjudicatory and Dispositional Hearing was held at which Children were deemed dependent and placed into the custody of the Agency. (N.T. p. 36). The Dauphin County Juvenile Court found that aggravated circumstances existed based upon the previous involuntary termination of parental rights as to Mother's other children.

The Agency established the following service objectives for reunification:

1. Attend all court hearings and monthly treatment plan meetings.

2. Sign all releases of information forms requested to ensure the compliance in meeting identified objectives.

3. Notify the Agency within 24 hours of new residence or new contact information.

4. Reimburse the County of Dauphin for the support of any children in placement in an amount to be determined by the Dauphin County Domestic Relations Office.

5. Obtain and maintain clean, safe, stable and appropriate housing for herself and her children for a minimum of 3 months with rent and utility bills kept current.

6. Follow up with Harrisburg Housing Authority in August 2014.

7. Obtain and maintain a CMU worker and actively participate in recommended services.

2

8. Participate in and follow all recommendations of psychiatric evaluation.

9. Learn and demonstrate appropriate stress management skills and coping skills.

10. Participate in therapy as deemed necessary by evaluations.

11. Provide proof of legal income to support herself and her children.

12. Complete a budget to determine what income is needed to maintain housing and additional expenses.

13. Provide proof of legal employment and income, or consistent income, to support herself and the children.

14. Apply for additional income through Pennsylvania Department of Health and Human Services and Supplemental Security Income ("SSI").

15. Participate in recommended parenting classes and provide proof of attendance.

16. Participate in reunification services; demonstrate understanding of information provided and skills learned.

17. Participate in Ages and Stages questionnaire for both children and follow recommendations if necessary.

(Petition for Goal Change to Adoption and Involuntary Termination of Parental Rights, May 18, 2016, para. ttt.(1)-(17); para . uuu. (1)-(11)).

As to the objective that Mother obtain and maintain safe and appropriate housing, while Z.O.B. and Z.J.M were in placement, Mother, pregnant with another child, resided in Lourdeshouse Maternity Home [4], a temporary home for pregnant women. (N.T. p. 58). Mother gave birth to that child in December 2013. (N.T. p. 56). In October 2014, Mother moved to Bretheren Housing Association. *Id.* In June, 2015, Mother was discharged from the Bretheren Housing Association for failure to follow program rules by allowing unauthorized persons into

---

[4] Incorrectly referred to in the transcript as "Lord's House".

3

the home. (N.T. p. 79). Mother then moved to her mother's home, which was not an approved home for the Children. (N.T. pp. 79-80; N.T. p. 81).

As to mental health objectives, Mother completed a psychiatric evaluation in February 2014. Mother was diagnosed with bipolar II disorder, borderline personality disorder and post-traumatic stress disorder. (N.T. p. 57; Agency Exhibit 9). Mother was discharged from Northwestern Human Services as unsuccessful for noncompliance with attendance at weekly outpatient sessions. (N.T. p. 57). In August 2014, Mother began bi-weekly outpatient counseling with Youth Advocate Program. (N.T. p. 59). Mother initially complied with the treatment schedule but was discharged as unsuccessful in December 2014 for missed sessions. (N.T. p. 60). Mother did not obtain a Case Management Unit Mental Health Services worker as directed. *Id.*

Next, in February 2015, Mother sought mental health services from Catholic Charities. When Mother's therapist left the practice, Catholic Charities offered Mother the opportunity to continue there or seek a new therapy provider. Mother failed to seek a new provider and was discharged from Catholic Charities as unsuccessful in August 2015. (N.T. pp. 82-83; N.T. p. 98). From August 2015 until the time of the filing of the Petition, Mother did not obtain recommended mental health treatment.

As to the objective that Mother obtain and maintain legal employment and establish a budget, at no time did Mother document a legal source of income. (N.T. p. 61). Mother told the Agency that she was employed at various places but never produced pay stubs. (N.T. p. 81). Mother consistently relied upon the Agency to provide for her children's basic needs. Mother did not meet the needs of the single child who remained in her care, which raised significant concern as to her ability to care for three children. (N.T. p. 63).

4

On May 18, 2016, the Agency filed a Petition for Goal Change to Involuntary Termination of Parental Rights as to Mother and Father. At the time of the filing of the Petition, the Children had been in care for 32 months, 17 months beyond the requirements of the Adoption and Safe Families Act.

## FATHER

Father was incarcerated during that time that Ms. Raines served as caseworker. (N.T. pp. 26-27). Ms. Raines had no contact with him. *Id.*

Following release from incarceration in approximately March 2014, Father resided at Community Corrections Center. (N.T. p. 51). Father attended permanency review hearings on May 6, 2014, August 5, 2014 and November 4, 2014. Father attended visits with the Children during the time period of April 2014 through June 2014. (N.T. p. 90).

In June 2014, Agency caseworker Courtney Carney met with Mother, Father and a Keystone reunification worker. (N.T. p. 52). Father would have been permitted to leave the Community Corrections Center at that time if he had an approved home plan. (N.T. p. 54). However, Father did not obtain an approved home plan. *Id.* In August 2014, Ms. Carney learned from Mother as of July 2014, Father was re-incarcerated. *Id.* During his incarceration, Father sent letters to the Children. (N.T. pp. 69-70).

Father was released from incarceration in January 2015. (N.T. p. 91). Father presented as a resource for Children at that time, but did not obtain a stable home for Children or a source of income. (N.T. p. 91).

Father failed to refrain from criminal activities. In May 2015, Father was charged with three counts of burglary, criminal trespass, public drunkenness, terroristic threat with intent to terrorize

5

another, public drunkenness, resisting arrest and aggravated assault. (N.T. pp. 87-88). Mother was the victim in relation to those charges. (N.T. p. 88). Father pleaded guilty to 5 of the above charges. The court imposed a sentence of 36-72 months. (N.T. p. 88-89; N.T. p. 115, Agency Exhibit 12).

In July 2015, the Agency added to the service objectives the requirement that Father complete a mental health evaluation and drug and alcohol evaluation. (N.T. p.92). At no time has Father provided documentation to the Agency which evidences evaluation or treatment. (N.T. p. 93; N.T. p. 116).

The Agency undertook efforts to find kinship care and familial resources for Children. The Agency received a response only from the Sheiry family. (N.T. pp. 70-71).

## BONDING ASSESSMENT

Howard S. Rosen, Ph.D., conducted a bonding assessment at the request of Mother. Dr. Rosen considered whether a bond existed between Mother and Children and how that bond compared to a bond which might exist between Children and the foster family caregivers. (N.T. p. 12).

Dr. Rosen noted that at the time of the bonding assessment, Children had lived in the foster home for approximately 25 months. (N.T. p. 13). Dr. Rosen visited Mother's home and the foster parents' homes at approximately the same time of day to observe Children's activities, whether they seemed to enjoy those activities, whether they shared emotion and from whom they sought attention to address a need. *Id.* Based upon those observations. Dr. Rosen formed opinions as to the quality of interactions.

6

At Mother's home, Dr. Rosen observed Children seated at a table having a snack when he arrived. (N.T. p. 14). Children played with toys and Mother encouraged their play. Children cooperated with Mother in cleaning up the table. Mother exhibited an appropriate level of patience. *Id.*

Although Children cooperated with Mother, Dr. Rosen did not observe a close emotional bond between Mother and Children. *Id.* Dr. Rosen concluded that the interaction resembled that of a nursery school care situation in which an adult provided instruction with which Children complied. *Id.*

Dr. Rosen visited the foster parents' home at approximately the same time of day. (N.T. p. 15). Dr. Rosen testified that Z.O.B. greeted Dr. Rosen enthusiastically at the door. During the visit, Z.O.B. and the foster father worked together on a race car track. Dr. Rosen observed a high level of engagement between Z.O.B. and the foster father. Z.O.B. called the foster parents "my mom and my dad". (N.T. p. 17). Z.O.B. also exhibited a close attachment to other children in the foster home. *Id.* Dr. Rosen concluded that a close relationship existed. (N.T. p. 15).

During the same visit, Dr. Rosen observed Z.J.M. playing with a doll, pretending to tuck her into bed. The foster mother played with Z.J.M.. Z.J.M. then sat on the foster mother's lap for a majority of the visit. (N.T. p. 17).

Overall, Dr. Rosen opined,

> ... I came to the conclusion that it was in the children's best interests to remain
> with the foster parents; that it's clearly who the children see as their mother and
> father. And separating them from the caregivers who they've come to know and
> trust as their parents would have troubling consequences down the line in terms of

it would immediately create levels of insecurity and mistrust, and I think that leads to problems as they enter school age and later on. So it's not something that I would recommend.

\*\*\*

(N.T. p. 18).

Dr. Rosen further opined that although there would be some benefit to Children maintaining contact with the biological family, remaining with the foster parents is the most appropriate life course for them. (N.T. pp. 18-19). See also, Agency Exhibit 10, Bonding Assessment.

Dr. Rosen did not conduct a bonding assessment regarding Father. (N.T. p. 24).

Agency caseworker Aida Melendez testified that since assuming the case in December 2014, she has observed Children interact with the foster family. (N.T. p. 95). Throughout the time Children have been in their care, the foster family has met all of Children's emotional needs. (N.T. p. 95). Ms. Melendez has observed a close attachment between Children and the foster family. (N.T. p. 95). Children refer to other family members as brothers, sisters, mom and dad. (N.T. p. 102). Ms. Melendez believes adoption to be in the best interests of Children. (N.T. p. 94).

Mother testified that she has a fantastic relationship with Children, that they call her mom and call Mother's other child their brother. (N.T. p. 112).

## DISCUSSION

The record establishes by clear and convincing evidence that the Court properly terminated parental rights where Mother and Father failed to remedy the conditions which led to placement although services and opportunities to do so were made readily available.

8

The Agency sought termination of the Mother and Father's parental rights based upon the Adoption Act, 23 Pa.C.S. §2511(a)( 1), ( 2), (5) and (8), which provides:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would serve the needs and welfare of the child.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(1), (2), (5) and (8).

9

The standard of review governing the trial court's termination of parental rights is well settled. Namely,

> When reviewing an appeal from a decree terminating parental rights, [the Superior Court] is limited to determining whether the decision of the trial court is supported by competent evidence. *See In re K.C.W.*, 456 Pa. Super. 1, 689 A.2d 294, 298 (1997). Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. *Id.* Where a trial court has granted a petition to involuntarily terminate parental rights, [the Superior Court] must accord the hearing judge's decision the same weight we would give to a jury verdict. *See In re Child M.*, 452 Pa. Super. 230, 681 A.2d 793, 800 (1996). We must employ a broad comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence. *See In re Matsock*, 416 Pa.Super. 520, 611 A.2d 737, 742 (1992).

*In re C. S.* 761 A.2d 1197, 1199 (Pa. Super. 2000).

As the party seeing termination, the Agency bears the burden of establishing by clear and convincing evidence that grounds exist for termination of parental rights. *In re J.D.W.M.*, 810 A.2d 688, 690 (PA. Super. 2002). The standard of clear and convincing evidence means "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203-1204 (Pa. 1989).

In considering whether the party seeking termination has satisfied the provision of 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8) , we keep in mind that a parent has an affirmative duty to work towards the return of [her] children. *In re Adoption of J.J.*, 511 Pa. 590, 602, 515 A.2d 883, 889 (1986). At a minimum, that "affirmative duty requires that the parent show a willingness to cooperate with CYS to obtain the rehabilitative services necessary to enable the parent to meet the duties and obligations inherent in parenthood." *Id.* In a termination proceeding, the trial court must consider all the circumstances in determining whether a parent has fulfilled his

10

obligations; the court must measure the parent's performance in light of what would be expected of any individual under similar circumstances. *Matter of M.L.W.* 307 Pa. 29, 33-34, 452 A.2d 1021, 1023-24 (1982) *(citations omitted)*. Further, the Superior Court need only agree with the trial court's decision as to any one subsection in order to affirm the termination of parental rights. *In re J.E.* 745 A.2d 1250 (Pa. Super. 2000) see *also In re J.I.R.*, 808 A.2d 934, 940 n.6 (Pa. Super. 2002).

> The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have her parental rights terminated.
>
> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

\*\*\*

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental    rights are not preserved by waiting for a more suitable time to perform   one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008).

11

## MOTHER

The Agency met its burden of proof. At the conclusion of the hearing on the Petition, we set forth on the record an explanation of our findings and reasons. (N.T. pp. 119-127). We incorporate that statement herein. We amplify those reasons in this written Opinion.

We properly concluded that Mother made virtually no progress in accomplishing the Service Objectives essential to the safety and well-being of the children. Mother failed to obtain employment which would enable her to establish a safe home for the Children. Rather, Mother relied upon the foster family to provide stability and safety for the Children.

The Agency satisfied 23 Pa. C.S. §(a)(8) although the evidence meets the requirements of (a)(2) and (a)(5) as well.

Mother testified as to the efforts she made toward completing necessary mental health therapy and finding suitable housing and employment. Our Superior Court has consistently stated that termination under subsection 2511 (a)(8) does not require an evaluation of the parents' willingness or ability to remedy the conditions which led to placement of the [child]. Instead, as the Superior Court has reaffirmed, subsection (a)(8) "requires only that the conditions continue to exist, not an evaluation of parental willingness or ability to remedy them." *In re I.J.*, 972 A.2d 5, 11 (2009) (*internal citations omitted*).

Having found that the Agency proved the statutory grounds for termination of parental rights under 23 Pa.C.S. §2511(a)(8), we undertake a separate "best interests" analysis. Pursuant to Section 2511(b), a court must give 'primary consideration to the [developmental, physical and emotional] needs and welfare of the child." *In re J. E.*, 745 A.2d 1250, 1254-55 (Pa. Super. 2000) (*citations omitted*.) The statute provides,

12

> Other considerations. - The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6), or (8), the court shall not consider any efforts by the parent to remedy the condition described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

In addition, the Superior Court has stated that, while "Section 2511(b) does not explicitly require a bonding analysis, [case law provides that] analysis of the emotional bond, if any, between a parent and a child is a factor to be considered in determining the developmental, physical and emotional needs and welfare of the child under §2511(b)." *In the Matter of K.K.R.-S., K.M.R., K.A.R.,* 958 A.2d 529, 533 (Pa. Super 2008). The Superior Court has explained,

> Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent child bond, paying close attention to the effect of permanently severing the bond.

*In re C.P.,* 901 A.2d 516, 520 (Pa. Super. 2006)

We properly considered whether a bond exists between Mother and Children which, if broken, would cause detriment to Children. We do not question that Mother loves Children. However, Dr. Rosen's findings are particularly illuminating as to the lack of an emotional bond between Mother and Children. Also, although she loves Children, for an unreasonable period of time, Mother has failed to uphold her fundamental responsibility to take necessary action to provide a safe and stable home. "A parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe

13

environment." *In re J.A.S.*, 820, A.2d 774, 782 (Pa. Super. 2003). Further, "[b]onding cannot be in one direction only—that of child to parent—but must exhibit a bilateral relationship which emanates from the parents' willingness to learn appropriate parenting, anger management, drug rehabilitation and marital stability." *In the Matter of K.K.R.-S., K.M.R., K.A.R.*, 958 A.2d 529, 534 (Pa. Super 2008) citing *In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418-419 (Pa. Super. 2003). Even while the Children were in placement and a reunification plan set in place, the Mother failed to meet basic objectives established to enable her to address her psychological problems and ensure that she provided a safe and stable home.

In deciding the issue of the best interest of a child, the Superior Court has noted that it is essential to allow a child "a chance to have [his or her] fundamental needs met without the constant insecurity that comes with knowing that someday, perhaps in the unreasonably distant future, [they] might again be wrenched away from [their] committed and capable caregiver." *In re N.C.* 763 A.2d 913, 919 (Pa. Super. 2000). The record reflects that the needs and welfare of Children have been and are being met in the foster home. The foster parents demonstrate devotion and commitment to nurturing Children and ensuring their happiness and well-being. The family has conscientiously provided stability and love. Disrupting the Children's lives would be contrary to their best interests.

## FATHER

The record further demonstrates that for an unreasonable period of time, Father failed to meet service objectives essential to Children's well-being.

We do not make this finding solely upon the basis of Father's incarceration. We recognize that "[a]lthough incarceration will certainly impact a parent's capability of performing parental

14

duties, and *may* render a parent incapable of performing parental duties under subsection (a)(2), incarceration alone is not sufficient to support termination under any subsection." *In re I.G.*, 939 A.2d 950 (2007). However, "where the parent does not exercise reasonable firmness in 'declining to yield to obstacles' his [parental] rights may be forfeited." *In re A.L.D.*, 797 A.2d 326 (2002). Our Superior Court has found compelling a parent's failure to remain out of jail where parental rights are at risk. See, *In re : C.S.*, 761 A.2d 1197 (2000)(Termination upheld where, "even for the sake of the child, father could not stay out of jail.").

Here, Father failed to remain out of prison following release, but rather, incurred additional charges as a result of a violent confrontation with Mother. His re-incarceration renders him unavailable to Children for a number of years and unable to complete essential objectives to properly parent.

Finally, although Father has written letters to Children while incarcerated, the record is devoid of evidence of a bond between Father and Children. For the same reasons we set forth above, we conclude that Children must not be wrested from the loving family with whom they have bonded.

For all of the foregoing reasons the Decrees of Termination should be affirmed.

BY THE COURT:

JOHN F. CHERRY, JUDGE

August 31, 2016

15