J-A12044-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF: A.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.D., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 74 WDA 2020 |

Appeal from the Order Entered December 13, 2019
in the Court of Common Pleas of Allegheny County,
Orphans' Court at No(s):  CP-02-AP-0000047-2019.

| | | |
|---|---|---|
| IN THE INTEREST OF: T.A.D. A/K/A T.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.D., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 75 WDA 2020 |

Appeal from the Order Entered December 13, 2019,
in the Court of Common Pleas of Allegheny County,
Orphans' Court at No(s):  CP-02-AP-0000048-2019.

| | | |
|---|---|---|
| IN THE INTEREST OF: R.E.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.D., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 76 WDA 2020 |

J-A12044-20

Appeal from the Order Entered December 13, 2019,
in the Court of Common Pleas of Allegheny County,
Orphans' Court at No(s): CP-02-AP-0000049-2019.

BEFORE: KUNSELMAN, J., KING, J., and COLINS, J.*

MEMORANDUM BY KUNSELMAN, J.:                    FILED JULY 08, 2020

In this consolidated matter, Appellant D.D. (Father) appeals the orders involuntarily terminating his rights to his three daughters, five-year-old A.D., four-year-old T.A.D., and two-year-old R.D. (collectively, the Children), pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8) and (b).[1] After review, we affirm.

In its Pa.R.A.P. 1925(a) opinion, the orphans' court thoroughly addressed the complicated factual and procedural history, which we restate as follows:

> Children, Youth and Families of Allegheny County (CYF) filed a petition seeking termination of parental rights (TPR) relative to the Children on March 14, 2019. The Children had been removed from [the] parents' care pursuant to an Emergency Custody Authorization (ECA) since July 26, 2017. On August 23, 2017, they were adjudicated dependent pursuant to the Juvenile Act [...] with the Juvenile Court finding them to be without proper parental care and control. They were placed in the kinship foster care placement of their Maternal Grandmother on July 28, 2017 and have remained with [her] to date.
>
> Pursuant to the Joint Stipulations of Counsel, [...] the parents were married in Pittsburgh, Pennsylvania on March

_____

* Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court also terminated the rights of E.D. (Mother), who did not appeal.

- 2 -

30, 2014. Father testified that he is currently 42-years-old. Mother is currently 25. As of December 13, 2019, the date of the TPR hearing, the Children were 5, 4, and 2.

On January 2, 2015, Mother filed a Protection From Abuse (PFA) action against Father, alleging that he threw Mother and their child down a concrete sidewalk and that there is a history of physical and emotional abuse by Father including threats to kill her. With Father's consent, Mother obtained a Final PFA Order on January 14, but, on February 12, 2015, at Mother's request, the PFA Order was terminated. FN 1.

> FOOTNOTE 1: The language used by Mother in her request for termination of the PFA order is noteworthy, "I love him with all my heart and I (sic) willing to give it another shot and I promise you won't (sic) hear from us again."

The caseworker testified that the family first came to the attention of CYF on May 11, 2015 when the family was behind on rent and Mother, alleging that Father did not listen to her, sought support from various mental health agencies. Mother did not follow through with services and the case was "screened out" by the agency.

The family next came to the attention of CYF on June 25, 2015 as a result of a police referral for what the caseworker referred to as "interpersonal violence between caregivers." Apparently, the police took the Children to the home of [Maternal Grandmother] and the case was again "screened out" because CYF determined that the Children were safe in the care of [Maternal Grandmother].[2] Next, on June 2, 2016, Mother and Father reported to the agency that they were homeless and living in a car. They went to a homeless shelter and needed support. This case was also "screened out." On June 25, 2016, CYF received a referral from Washington County about an incident that took place outside of a homeless shelter where the parents were allegedly arrested for disorderly conduct and Father was charged with a firearms violation. FN 3.

_____

[2] We clarify that the Children were not placed in Maternal Grandmother's care until July 2017.

FOOTNOTE 3: Based on the testimony of Detective Crousey, a firearms charge from 2015 against Father was dismissed.

Apparently mother made the decision at that time that she would move herself and the children to Maternal Grandmother's home.   Therefore, the case was again "screened out."

Finally, in August of 2016, the case was accepted for services by CYF because Father reported that the family was homeless due to Mother's untreated mental health issues. Services were implemented to assist the family but the agency had difficulty locating the family and they were uncooperative and unhappy that CYF had appeared at their home unannounced.  In April 2017, the case was transferred to the current caseworker who utilized a locator service and was able to locate and meet with the family on May 5, 2017 at the location which has been the family home throughout the life of the case.  At the meeting, Father was cooperative but Mother was screaming and yelling at [the caseworker]. She obtained releases of information and determined that the two children ([the] youngest had not been born) were behind medically and needed supportive services.

[In] June [] 2017, the youngest child was born and reportedly tested positive for cocaine and marijuana.  The caseworker went to the home but was not permitted access by Mother.  The caseworker made a referral for intensive, crisis level in-home services for the family.  On July 25, 2017, the caseworker obtained and executed [an Emergency Custody Authorization] because the parents had failed to cooperate with the crisis services which were to have been implemented in the home.   The police accompanied the caseworker and she observed the home to be in complete disarray, smelling of urine and feces, with items all over the floor, only a mini-fridge for food, and bloody sanitary napkins in the bathroom sink.  The two older Children, wearing only diapers, were located in an upstairs bedroom with only a mattress and sheet and a blanket hanging in the window.  Mother was holding the newborn and the caseworker did not observe a crib or pack and play. The older Children's hair was matted and dirty; they were non-verbal (speaking only unintelligible gibberish); and the two-year-old appeared to have an issue with her gait.

CYF set goals for both parents in order to assist them in achieving reunification and the Juvenile Court conducted permanency reviews every three months. The permanency review orders find that neither parent demonstrated more than minimal compliance with the permanency plan and no more than minimal progress in remedying the circumstances which necessitated the original placement from November, 2017 until March 27, 2019 when Father's compliance was listed as moderate, although his progress continued to be minimal.

Several additional items in the caseworker's testimony are noteworthy relative to Father's compliance and progress. She testified that she continues to send hearing notices to both Mother and Father at the address from which the Children were removed and that she believes that they continue to reside together, although Mother is not at the home consistently. The caseworker also testified that she had gone to the home to implement coached visitation for Father and that she heard "smashing and crashing" and Mother shouting that [Father] better not put his hands on her and that she would kill him. As a result, on April 25, 2019, the coached visitation was postponed by court order pending domestic violence treatment. FN 6.

> FOOTNOTE 6: Father claimed that he was incarcerated as a result of an allegation by [Maternal Grandmother] that he molested one of the Children. He said that this happened when he was supposed to have the coached visitation. The caseworker testified that although there was a report that the youngest child had a bloody diaper and because the parents were having coached visitation at the time, there were potential perpetrators (along with [Maternal Grandmother]), that situation was quickly determined not to be the result of abuse and that Father was arrested on an unrelated domestic violence warrant when the police were contacted as a result of the "smashing and crashing" that she heard.

Father did not provide verification that he had completed [domestic violence] treatment until July 15, 2019.

CYF also presented the testimony of various police officers who testified to various incidents involving Mother and Father. One incident of note with respect to Father took

place on April 18, 2018 in which Mother sought police assistance claiming that Father had a knife and was going to kill her. At the time of investigation, it was determined that Father, who was very cooperative, did not have a knife but Mother had a crack pipe. Another incident took place on June 26, 2018, in which Mother was running towards Father with a 12-inch butcher knife. Mother was criminally charged but the case was dismissed or withdrawn because Father failed to appear to testify. Another incident involving Mother and Father took place on September 16, 2018, in which Mother and Father were both at the residence and Father struck a third party with a brick. The police officer also located a knife which Father denied using but Mother said Father had in his hand. The officer testified that she went inside of the residence at the time and it was in complete disarray, with items thrown everywhere and moldy food in all of the rooms.

The caseworker testified that the Children were doing well in [Maternal Grandmother's] care and that they are well-bonded to her. The parties also stipulated that [Maternal Grandmother] has been meeting each Child's developmental, physical and emotional needs and welfare since they were placed with her in July 2017. Evaluations were performed by Dr. Eric Bernstein, an expert in the field of individual and interactional psychological evaluations. Mother never appeared for any evaluations. [Maternal Grandmother] either missed evaluations or failed to bring the Children three times. Finally, after four scheduled evaluations, Dr. Bernstein concluded, that [Maternal Grandmother] serves as a capable caregiver to whom the Children are attached and that she meets the Children's needs and recognizes the importance of [Father's] role in the Children's lives even despite her resentment of his role in [Mother's] life. With respect to Father, Dr. Bernstein concluded that he exchanged affection and created an environment of play, fun and offered them support as necessary. However, Dr. Bernstein noted that he showed a lack of knowledge about the Children's overall developmental needs and well-being which Father attributed to the agency's failure to provide him with the necessary information.

At the hearing, Father denied responsibility for any of the conditions leading up to the removal of the Children.

Although he claimed he did everything he was asked to do by CYF, he questioned why he had to do it since it was not his fault. He acknowledged that he continues to reside at the residence that Mother leases, although he claimed that he has lived there by himself since the middle of 2018. In response to representations by the caseworker that he and Mother appeared together at the last Permanency Review hearing in Juvenile Court on September 4, 2019, Father testified that Mother has not visited the house since their last court hearing when she came to get clothes for court. Father admitted that Mother's residence was not suitable for the Children as it had a leaking roof and other deficiencies. However, he blamed the caseworker for not finding him another residence as he insisted that the lack of suitable housing was the only impediment to reunification. He blamed CYF and/or [Maternal Grandmother] for any missed visits. FN 9.

> FOOTNOTE 9: A great deal of time was spent at the hearing on the issue of missed visits and CYF introduced voluminous records of visitation schedules. (Exhibit 3). I am not focusing on these issues because I did not find grounds for termination for Father under Section 2511(a)(1) and further, any missed visits did not form the basis to support termination on any of the grounds that I did find.

Trial Court Opinion (T.C.O.), 2/14/20, at 1-7 (citations to the record and some footnotes omitted).

The orphans' court held the termination hearing on December 13, 2019 and issued its termination orders the same day. Father timely-filed this appeal. He presents the following issues for our review:

> 1. Whether the [orphans' court] committed fatal error and/or abused its discretion in finding [CYF] met their burden of proof and proved by clear and convincing evidence that the parental rights of [Father] should be terminated pursuant to 23 Pa.C.S.A. §2511(a)(2), (a)(5), (a)(8)?

- 7 -

2. Whether the [orphans' court] erred and/or abused its discretion by finding that [CYF] met their burden of proof and proved by clear and convincing evidence that terminating the parental rights of [Father] best meets the needs and welfare of the minor child[ren] pursuant to 23 Pa.C.SA. §2511(b)?

Father's Brief at 9.

We review these issues mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child[.]

In re C.M.K., 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

In this case, the court terminated Father's parental rights pursuant to subsections 2511(a)(2), (5), (8), and (b). Those subsections provide:

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

[…]

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

[…]

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

[…]

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the

developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1) … or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

Instantly, we observe Father's vague concise statement of matters complained of on appeal partially impeded the orphans' court's ability to address Father's issues. See T.C.O. at 8. The court explained: "A review of Father's concise statement discloses no specific rulings or errors I committed but simply reiterates that my conclusions were in error. Such general language fails to preserve any issues for review and renders the [orphans'] court incapable of explaining its reasoning and the appellate court unable to perform a meaningful review." See id. (citing Lineberger v. Wyeth, 894 A.2d 141 (Pa. Super. 2006)). However, the orphans' court subsequently addressed the issues as best it could, because it acknowledged the gravity of a termination proceeding.

Given the striking finality of the termination case, we are loath to find waiver. Still, "[w]e cannot scour the record on appellant's behalf trying to find mistakes by the hearing judge. It is the appellant's responsibility to precisely identify any purported errors." In re Child M., 681 A.2d 793, 799 (Pa. Super. 1996). Notwithstanding Father's sweeping charge that CYF failed to meet its

burden, we must limit our review only to those specific points raised in the argument section of Father's Brief. See id.; see also Pa.R.A.P. 2119(a) (the argument section of an appellate brief must contain a full discussion of the points raised accompanied by citation to pertinent authority).

Turning now to the substance of our review, we observe that we need only agree with the court as to any one subsection of 2511(a), as well as subsection 2511(b) in order to affirm. In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). We analyze the court's decision to terminate under subsection 2511(a)(8) and (b).

Under Section 2511(a)(8), the petitioning agency must prove by clear and convincing evidence that: 1) the children have been removed from the care of the parent by the court for at least 12 months; 2) the conditions which led to the removal or placement of the child continue to exist; and 3) termination would best serve the needs and welfare of the children. 23 Pa.C.S.A. § 2511(a)(8); see also In re C.L.G., 956 A.2d 999, 1005 (Pa. Super. 2008) (en banc).

The first element is beyond dispute. The Children were removed from parental care and placed with their Maternal Grandmother in July 2017, approximately 29 months prior to the termination hearing. Regarding the second element, Father does not contest the court's determination that the conditions which led to removal still exist. See Father's Brief at 15-19. His primary argument is that conditions can be remedied, and that he remains willing to remedy the conditions. Id. at 16. But that is not a proper

consideration under Section 2511(a)(8); the question is whether the conditions still exist.

Ultimately, CYF has propped Father up with services for over two years, but the best argument Father can muster is that it would not take him long to remedy the conditions. This argument is without merit. See In re Z.S.W., 946 A.2d 726, 732 (Pa. Super. 2008) (a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.") While the orphans' court found Father was moderately compliant with CYF, the court also found that his progress was minimal. For instance, in its Pa.R.A.P. 1925(a) opinion, the court explained that its overarching concern with respect to all three statutory termination sections was Father's failure to realize that the Children were in serious danger when they were removed from him. See T.C.O. at 9. Because Father continued to deny responsibility for the conditions that led to removal, the court feared that the Children would be neglected again. The court opined that "services did not appear to help." Id. at 10. Father provides no argument or support to refute this determination. We agree with the orphans' court's conclusions that CYF sufficiently proved the second element of the Section 2511(a)(8) analysis.

The third and final element under a Section 2511(a)(8) analysis is whether termination would best serve the Children's needs and welfare. This inquiry is distinct, albeit discreetly so, from the "needs and welfare" analysis under Section 2511(b). We have previously explained the nuance as follows:

> We note that, initially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceedings to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that a parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court engage in the second part of the analysis pursuant to Section 2511(b)[.] Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the Children], as proscribed by Section 2511(b)[.]

In re C.L.G., 956 A.2d at 1008-1009 (internal citations and some quotation marks omitted).

While Father dedicates an entire portion of his Brief to the Section 2511(b) "needs and welfare" analysis, he offers no argument concerning the Section 2511(a)(8) analysis beyond a generic statement that the Children would be best served by being raised by their biological father. See Father's Brief at 18 (citing Santosky v. Kramer, 455 U.S. 745, 767 (1982)). Again, we will not scour the record in search of support for this contention; we conclude that the orphans' court did not abuse its discretion in determining that CYF met all the elements of termination under Section 2511(a)(8).

Next, we consider Children's needs and welfare pursuant to subsection (b). See Z.P., 994 A.2d 1108, 1121 (Pa. Super. 2010). "In this context, the court must take into account whether a bond exists between child and parent,

and whether termination would destroy an existing, necessary and beneficial relationship." Z.P., 994 A.2d at 1121. The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. Id. Ultimately, the concern is the needs and welfare of a child. Id.

We have said:

Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parent's rights would destroy something in existence that is necessary and beneficial.

Matter of M.P., 204 A.3d 976, 984 (citing Z.P., 994 A.2d at 1121).

The court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. M.P., 204 A.3d at 984 (citing In re N.A.M., 33 A.3d 95, 103 (Pa. Super. 2011)). Where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists. Id. "[A] parent's basic constitutional right to the custody and rearing of … her child is converted, upon the failure to fulfill … her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." In re B., N.M., 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

- 14 -

Instantly, Father notes that CYF's expert, psychologist Dr. Bernstein, and its own caseworker recognized an attachment between the Children and Father. See Father's Brief at 21-22. Father also argues that some of his missed visits were caused by Maternal Grandmother's vacation and her intentional withholding of the Children. Id. at 22. Father concludes that permanency could have been obtained without termination, had CYF pursued permanent legal custodianship. Id. at 22-23.

Indeed, Dr. Bernstein observed Father showing affection for the Children and that Father created a supportive environment of play and fun. He noted that Father and Children shared a limited bond. But in Dr. Bernstein's estimation, the bond was limited because Father displayed a lack of appreciation for the Children's developmental needs and visitation schedule. Dr. Bernstein was unable to provide an expert opinion about permanency, as Mother did not attend her scheduled appointments. Dr. Bernstein ultimately opined that Maternal Grandmother was a capable caregiver to whom the Children were attached. Meanwhile, the CYF caseworker recognized attachment between the Children and Father, but testified that the Children were, in fact, bonded to Maternal Grandmother. The Children did not ask for Father, look for him, or speak with him on the phone.

Moreover, when the Children entered Maternal Grandmother's care, the two eldest Children were nonverbal. A.D., the oldest child, might be on the autism spectrum, although there does not yet appear to be a definitive diagnosis. Meanwhile, Father either denied that the Children had any issues,

or blamed CYF for not making him aware of them. In the two plus years since the Children entered Maternal Grandmother's care, the Children have been forced to rely solely on Maternal Grandmother to meet their needs and welfare. Clearly, whatever bond the Children had with Father was not so beneficial to merit preservation. The court did not abuse its discretion by determining that CYF met its burden under Section 2511(b).

In sum, we conclude that the orphan's court did not err or commit an abuse of discretion by finding involuntary termination of Father's rights was warranted under Section 2511(a)(8) and (b) of the Adoption Act.

Orders affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/8/2020